IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| | § | |
| | § | |
| | § | |
| RBC CAPITAL MARKETS, LLC, | § | No. 140, 2015 |
| | § | |
| Defendant Below, | § | |
| Appellant/Cross-Appellee, | § | Court Below: |
| | § | |
| v. | § | Court of Chancery of the |
| | § | State of Delaware |
| JOANNA JERVIS, | § | |
| | § | C.A. No. 6350-VCL |
| Plaintiff Below, | § | |
| Appellee/Cross-Appellant. | § | |
| | § | |
| | § | |

Submitted: September 30, 2015
Decided: November 30, 2015

Before **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices; and **JOHNSTON**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Myron T. Steele, Esquire, and T. Brad Davey, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Alan J. Stone, Esquire (*Argued*), Daniel M. Perry, Esquire, Benjamin E. Sedrish, Esquire, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Appellant/Cross-Appellee RBC Capital Markets, LLC.

Joel Friedlander, Esquire (*Argued*), and Jeffrey M. Gorris, Esquire, Friedlander & Gorris, P.A., Wilmington, Delaware; Of Counsel: Randall J. Baron, Esquire, and David Knotts, Esquire, Robbins Geller Rudman & Dowd LLP, San Diego, California, for Appellee/Cross-Appellant Joanna Jervis.

Jack B. Jacobs, Esquire, Sidley Austin LLP, Wilmington, Delaware; Of Counsel: A. Robert Pietrzak, Esquire, Andrew W. Stern, Esquire, Daniel A. McLaughlin, Esquire, and Cameron Moxley, Esquire, Sidley Austin LLP, New York, New York; John K. Hughes, Esquire, Sidley Austin LLP, Washington, D.C., *Amicus Curiae* for Securities Industry and Financial Markets Association.

---

[*] Sitting by designation pursuant to Del. Const. art. IV, § 12.

Raymond J. DiCamillo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware;  Of Counsel:  Mark A. Kirsch, Esquire, Jonathan C. Dickey, Esquire, Gabrielle Levin, Esquire, and Jonathan D. Fortney, Esquire, Gibson, Dunn & Crutcher LLP, New York, New York; John F. Olson, Esquire, Gibson, Dunn & Crutcher LLP, Washington, D.C., *Amicus Curiae* for National Association of Corporate Directors.

**VALIHURA**, Justice:

# I.    INTRODUCTION

Pending before this Court is an appeal and cross-appeal arising out of a final judgment of the Court of Chancery finding that RBC Capital Markets, LLC ("RBC" or "Appellant") aided and abetted breaches of fiduciary duty by former directors of Rural/Metro Corporation ("Rural" or the "Company") in connection with the sale of the Company to an affiliate of Warburg Pincus LLC ("Warburg"), a private equity firm.  The Court of Chancery issued four opinions which form the basis of this appeal.

*First*, on March 7, 2014, the Court of Chancery issued a post-trial decision and held RBC liable to a class of Rural stockholders (the "Class") for aiding and abetting breaches of fiduciary duty by Rural's board of directors (the "Liability Opinion" or "*Rural I*").[1]

*Second*, on October 10, 2014, the Court of Chancery issued a decision setting the amount of RBC's liability at $75,798,550.33, constituting 83% of the $91,323,554.61 in total damages that the Class suffered, which represented the difference between the value the Company's stockholders received in the merger and Rural's going concern value ("*Rural II*").[2]  The trial court awarded pre- and post-judgment interest at the legal rate from June 30, 2011 until the date of payment.

*Third*, on December 17, 2013, after Rural filed a suggestion of bankruptcy, the Court of Chancery granted Joanna Jervis's ("Jervis" or "Lead Plaintiff") motion to bar

---

[1] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54 (Del. Ch. 2014) [hereinafter, "*Rural I*, 88 A.3d at __"].
[2] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205 (Del. Ch. 2014) [hereinafter, "*Rural II*, 102 A.3d at __"].

1

consideration of a declaration from Stephen Farber, who joined the Company as its Chief Financial Officer on June 25, 2013, two years after the transaction, in which he presented reasons for the entity's subsequent financial turmoil (the "Farber Declaration").

*Finally*, Lead Plaintiff filed a fee application with the Court of Chancery, seeking to shift attorneys' fees for RBC's alleged misrepresentations in its pre-trial filings. The Court of Chancery, on February 12, 2015, denied the application. On February 19, 2015, the Court of Chancery entered its Final Order and Judgment.

RBC raises six issues on appeal, namely, (1) whether the trial court erred by holding that the board of directors breached its duty of care under the enhanced scrutiny standard enunciated in *Revlon*; (2) whether the trial court erred by holding that the board of directors violated its fiduciary duty of disclosure by making material misstatements and omissions in Rural's proxy statement, dated May 26, 2011; (3) whether the trial court erred by finding that RBC aided and abetted breaches of fiduciary duty by the board of directors; (4) whether the trial court erred by finding that the board of directors' conduct proximately caused damages; (5) whether the trial court erred in applying the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA"); and (6) whether the trial court erred in calculating damages.[3]

On her cross-appeal, Jervis argues that the Court of Chancery erred in holding that fee shifting requires a finding of "glaring egregiousness."

---

[3] The Securities Industry and Financial Markets Association ("SIFMA") and National Association of Corporate Directors ("NACD") filed *amici curiae* briefs in support of reversal.

In this decision, we AFFIRM the principal legal holdings of the Court of Chancery.

## II.  FACTS

As a preliminary observation, we note that, at oral argument before this Court, counsel for RBC emphasized that RBC "intentionally made appellate arguments that do not require this Court to review findings of fact."  Although RBC has chosen to avoid any direct and specific challenge to the facts as found by the trial court, this Court, nevertheless, has examined the appellate record in its entirety.

### A.  *The Key Players*

Rural is a Delaware corporation headquartered in Scottsdale, Arizona.  Founded in 1948, the Company is a leading national provider of ambulance and private fire protection services that serves more than 400 communities across 22 states.  Its ambulance business offers emergency and non-emergency transports under contracts with government organizations, hospitals, nursing homes, and other healthcare entities.  Rural's shares traded on NASDAQ from July 1993 until the merger closed on June 30, 2011.  Upon closing, each publicly held share of Rural common stock was converted into the right to receive $17.25 in cash.

Before the merger, the board of directors had seven members: Christopher S. Shackelton, Eugene I. Davis, Earl P. Holland, Henry G. Walker, Robert E. Wilson, Conrad A. Conrad, and Michael P. DiMino (the "Board").  Of the Board's seven members, the trial court, in *Rural I*, determined that Wilson, Davis, Holland, Conrad,

Walker, and Shackelton were "facially, independent, disinterested, outside directors." DiMino was Rural's President and CEO. Wilson did not vote on the merger.

Shackelton, Davis, and Walker comprised the special committee (the "Special Committee" or "Committee"). Shackelton was its Chair. The trial court found that Shackelton played the most significant role, and that Davis and Walker generally deferred to Shackelton.

On April 8, 2013, all parties filed pre-trial opening briefs and all defendants were headed for trial. On April 25, 2013, plaintiffs advised the Court of Chancery of an agreement in principle to settle with Moelis for a payment of $5 million to the Class. On April 29, 2013, the individual defendants advised the Court of Chancery that they had also reached an agreement in principle to settle for a contemplated payment of $6.6 million to the Class. Thus, the case proceeded to trial solely against RBC.

## B. The Company's Business Plan

In May 2010, the Board hired Michael P. DiMino as the Company's new President and CEO and gave him a mandate to grow the Company. To carry out his mandate, DiMino developed new growth strategies. As discussed in the Company's public filings, Rural planned to:

> *Increase Revenue Through Strategic Growth.* Flexibility in our capital structure allows us to actively pursue acquisitions of ambulance transport businesses and to consolidate business in the fragmented ambulance transport market. We will pursue acquisitions that are accretive to our profitability, leverage our strengths and complement our existing national footprint.
>
> *Increase Revenue Through Organic Growth.* We believe our proven track record of high-quality patient care, meeting and exceeding contract

4

expectations and progressive public/private partnering arrangements aimed at assisting communities to achieve their cost structure goals, creates opportunities for us to increase revenue by winning competitive bids for emergency ambulance services. Additionally, we will increase non-emergency ambulance service revenue within existing and contiguous service areas by leveraging our community name recognition and record of service excellence to gain preferred provider status with local hospital systems, nursing homes and other healthcare facilities.

*Increase Revenue Through New Market Non-Emergency Contracts.* We believe we can increase revenue by entering new markets where we do not have an emergency transportation presence. We will enter new markets through preferred provider agreements with local and regional hospitals and healthcare systems for non-emergency general transportation services. We believe our name recognition and service excellence in our existing markets will allow us to gain entrance into new markets to provide non-emergency services to larger scale customers.

The trial court concluded that "[t]he evidence at trial demonstrated that Rural's growth strategy was reasonable and achievable."[4] However, at trial, DiMino also testified about the risks facing the Company in late 2010 and early 2011, which included potential difficulties integrating acquisitions and changes in the sources of payments for the Company's services. The Company's public filings detailed these risks.

RBC was hired by the Special Committee as Rural's primary financial advisor in connection with the Company's decision to explore strategic alternatives in late 2010. Anthony Munoz, a Managing Director at RBC, was Rural's lead banker. Marc Daniel, RBC's lead M & A banker, participated in the Rural sale process alongside Munoz. Moelis & Company LLC ("Moelis") was brought on as Rural's secondary financial advisor. Richard D. Harding, a Managing Director, was Rural's contact at Moelis.

---

[4] *Rural I*, 88 A.3d at 107.

Before being engaged by the Company, RBC had, according to the Board minutes, a "significant (and satisfactory) track record with the Company in relation to debt financing transactions and other advisory matters." In addition to maintaining a relationship with Rural, RBC also had an "active dialogue" with Warburg, the Company's eventual acquirer, which extended beyond Warburg's participation in the Rural sale process. Sean Carney, a partner at Warburg, was the point person for Warburg's Rural acquisition team.

The Special Committee was first formed in August 2010, after RBC advanced the idea of Rural acquiring American Medical Response, Inc. ("AMR"), its primary national competitor in the ambulance business. AMR was a subsidiary of Emergency Medical Services Corporation ("EMS"). As a response to RBC's approach, the Board formed the Special Committee with the authority to oversee the process of formulating Rural's acquisition strategy concerning AMR.

In October of 2010, the Board re-formed the Special Committee to respond to an approach by Irving Place Capital and Macquarie Capital (jointly, the "Consortium"), which, together, expressed a preliminary interest in acquiring the Company. The Board regarded the Consortium's expressed interest in acquiring Rural for $10.50 to $11.50 per share as being too low to justify engagement. Shackelton intimated that the price offered by the private equity firms "was plainly insufficient in relation to the Company's stand-alone prospects." Nonetheless, later that month, on October 27, 2010, the Board charged the Special Committee with the "authority to oversee the process of reviewing the Company's alternatives, making recommendations to the Board, determining a course of

6

action and, if it deems appropriate, negotiations and related interactions with the [C]onsortium . . . ."[5] The two private equity firms suggested that they would be willing to raise their interest level to $15.00 per share, but discussions with the Consortium concluded when Irving Place Capital withdrew after Rural affirmed that it was not for sale at the revised price point.

During the liability phase of the proceedings, the plaintiffs did not contend that any director breached his duty of loyalty, but they did argue, and the trial court found, that Shackelton, Davis, and DiMino each had personal circumstances that inclined them towards a near-term sale.[6] For example, Davis, in the Fall of 2010, served on a dozen public company boards, which brought him into conflict with an Institutional Shareholder Services Inc. ("ISS") policy against "over-boarded" directors.[7] As President and CEO of PIRINATE Consulting Group LLC, Davis often joined boards as a hedge fund nominee or as an outside director acceptable to stockholder activists. Beginning in 2004, Davis served as chairman of the board for Atlas Air Worldwide Holdings ("Atlas Air"). He was particularly concerned about avoiding a recommendation against his re-election at Atlas Air. At his deposition, Davis testified that ISS had "uniformly recommended against [him]" due to the fact that he routinely sat on the boards of more than six public

---

[5] According to the minutes, "[t]he committee was instructed to update the Board regarding its activities on a regular basis, and to return to the Board to provide its recommendations and/or to obtain further instructions and authority when the need therefor is apparent."

[6] In *Rural II*, the trial court determined that Shackelton and DiMino's unique reasons to favor a near-term transaction presented a conflict, and that, but for the settlement, they would have shared a common liability with RBC to the Class.

[7] Davis testified that "[o]ne of ISS's rules is they will not support a candidate for a board who sits on the boards of more than six public companies."

7

companies. Through counsel for Atlas Air, Davis met with ISS and agreed with them on a process where over time he would reduce his number of board positions to six and, pending the completion of that process, ISS would continue to give him a positive recommendation.[8] Davis and ISS set a deadline date of April 2011 for the completion of the director's board seat reduction process. Davis testified that "Rural/Metro had already decided to put itself up for sale, so I put Rural/Metro on the list of companies I was going to leave."[9]

Like Davis, Shackelton had personal reasons for pushing a near-term sale. Shackelton was a managing partner of Coliseum Capital Management, LLC ("Coliseum"), a hedge fund he co-founded in 2006. Coliseum generates returns by taking concentrated positions in small capitalization companies, obtaining influence, and then facilitating an exit within approximately three to five years. Over the course of 2007, Coliseum began acquiring shares of Rural. At trial, Shackelton suggested that, in so doing, the fund managers believed they were investing in an undervalued company and over the course of a longer-term horizon they would be able to recognize that value. By October of 2010, Coliseum had amassed an equity stake in Rural of approximately 12%, at a cost basis of "substantially less than $10 a share." By early 2011, Coliseum's position in the Company's securities equated to more than 20% of the investment firm's

---

[8] The Court of Chancery further found that "[a] sale of Rural would reduce [Davis's] number of board seats, while letting him exit on a professional high note." *Rural I*, 88 A.3d at 65. The trial court observed that a Rural business combination before his directorship deadline would enable Davis to realize $200,000 in the Company's equity, which would vest upon a change of control and which he would otherwise have to leave on the table if Rural did not change hands prior to April 2011. *Id*.

[9] B615.

portfolio. The Court of Chancery, therefore, concluded that Shackelton saw an M & A event as the next logical step for Coliseum's involvement with Rural.

DiMino was appointed Rural's President and CEO effective June 2010. He also assumed a seat on Rural's Board. DiMino, upon arrival at Rural, formulated a three part strategy to grow the Company: (i) acquire local and regional providers in the highly fragmented ambulance transport industry, (ii) enter new markets by securing contracts with hospitals for non-emergency, general transportation services, and (iii) secure new government contracts through the request-for-proposal process. The trial court determined that Shackelton's interest in an M & A event was also a reaction to DiMino's business plan, and that DiMino's growth plan conflicted with Coliseum's investment strategy.

Moreover, the trial court concluded that DiMino was a late convert to the idea of a sale. During most of 2010, he favored keeping Rural independent, but changed his mind after his six month performance review, when he received negative feedback from Shackelton and Davis due to his response to the Company's exploratory discussions with private equity firms. In a November 1, 2010 email to Conrad and Walker, DiMino stated that his desire was to "wait to sell th[e] business until after" it had realized on certain of its growth initiatives.[10] He continued by noting that he had spoken with RBC and Shackelton, who told him that "now is the time to sell." Shackelton also told DiMino that "[h]e want[ed] to do this in the next 3 to 6 months and have [DiMino] prepare the

_____

[10] B21. To that end, an internal RBC memorandum posited: "Under new leadership, the Company will also pursue tuck-in acquisitions that are both strategic and accretive to EBITDA." B269.

9

business for this process." DiMino told Walker and Conrad: "Obviously this changes my direction and perspective. Instead of running the business for the mid to long term[,]" DiMino would have to "make decisions for the [] short term." DiMino also stated in the November 1, 2010 email that, in his opinion, he "would wait to sell th[e] business . . . [until s]ometime after June of next year." He concluded by suggesting that he had "a lot already invested personally" at Rural. Analysts, such as J.P. Morgan, recognized that there was "[p]otential for meaningful . . . stock price appreciation . . . as [the] growth plan is executed on/realized."

In notes to himself, dated December, 1, 2010, Shackelton documented feedback from Macquarie Capital that suggested that DiMino was "an impediment to a sale." Shackelton wrote that he "[b]elieve[d that DiMino] was looking for buyers that would be more favorable to him," and that there was a "[u]niversal recognition [at Rural] that [DiMino didn't] want to sell the [C]ompany for personal reasons." In fact, because he surmised that DiMino did not stand "to gain from the transaction" with the Consortium, Shackelton determined that DiMino "introduced enough concerns regarding the risks of buying the business to scare off buyers[.]"

DiMino's perspective changed following his performance review. Davis and Shackelton's collective input was particularly negative. The trial court found that, from that point on, DiMino supported a sale and deferred to Shackelton.

Davis reasoned that DiMino shifted from being "unalterably opposed" to a sale to being a willing participant, due to the fact that the pool of potential acquirers was flooded with financial buyers. In deposition testimony, Davis stated:

10

[T]he light bulb finally went over his head that they'd probably ask him to run it, and given the way that his relationship with the Board -- our Board had deteriorated, I think at some point, he came to the conclusion he would be better off with a different Board, and a new owner would bring a different Board, on top of which he was going to prematurely cash out on the equity that he had received less than a year earlier. And probably if he was given the job back, would get more equity. It was a very good deal for him. He finally figured it out.

RBC fails to mount any serious challenge to the trial court's factual findings with respect to the personal interests of Shackelton, Davis, and DiMino as being clearly erroneous, and our independent review of the record confirms that such findings are supported by the evidence.

## C. *The Special Committee and Engagement of RBC*

In early December 2010, EMS was rumored to be in play. The trial court found that Munoz and his RBC colleagues realized that a private equity firm that acquired EMS might decide to buy Rural rather than sell AMR. It found that RBC recognized that if Rural engaged in a sale process led by RBC, then RBC could use its position as sell-side advisor to secure buy-side roles with the private equity firms bidding for EMS. Further, the trial court concluded that RBC believed that with the Rural angle, it could get on all of the EMS bidders' financing trees. The record evidence supports these findings. In a December 18, 2010 email, Moti Rubin urged his RBC colleagues to get "up to speed with all of ems (amr and emcare) as who knows what we end up financing[.]" He wrote:

> As you know we are working all angles re EMS. Rural is an important angle and most sponsors want to use that angle in some way – either splitting up EMS and having [Rural] buy AMR . . . or [the] sponsor buying the [*sic*] ems and [Rural] and combining the 2, or other combos. Clearly this is the most important fee event opportunity we have in healthcare and [there is a] reasonable probability this will happen in some shape or form.

11

we are not treeing up yet but I want to make sure that we are getting ready to move swiftly on this.

Four days later, Rubin told Munoz that RBC "should be able to get on all [EMS bidder financing] trees given the [Rural] angle."[11]

The Rural Board met on December 8, 2010. The trial court found that the Board re-activated the Special Committee as a response to the meeting, but, in so doing, it did not authorize the Special Committee to pursue a sale. The evidence reflects that, at the meeting, Shackelton discussed the Company's long-term strategic choices and outlined three alternatives: "(1) continue to pursue the Company's current standalone business plan (including taking advantage of opportunities to purchase smaller competitors); (2) pursue a sale of the Company; or (3) pursue a transaction that would seek to take advantage of the synergies available via some form of business combination transaction involving the Company and its principal competitor." Shackelton, at the time, suggested that he had not "formulated a preference among the three" strategic alternatives. When Shackelton's presentation concluded, the Board unanimously agreed that the Company should promptly proceed to engage an appropriate strategic advisory team and pursue an in-depth analysis of the alternatives discussed during the meeting.

Also at the December 8 meeting, the Board "unanimously agreed that the scope of authority for the [S]pecial [C]ommittee created at the Board's meeting of October 27, 2010 would be revised to include this project, and authorized and directed the [C]ommittee to proceed to interview advisers." Shackelton maintained his position as

---

[11] In a December 8, 2010 email to Munoz, Shackelton wrote: "At the right price, we can be part of the 'angle[.]'"

12

Chair of the Special Committee. At the same meeting, Shackelton took over as Chairman of the Board from Conrad.

The trial court found that Shackelton told RBC that he was open to reaching out to private equity firms about partnering on an acquisition of EMS. Also, on December 13, Shackelton advised his fellow directors that he was setting up a meeting to interview potential financial advisors.

On December 14, EMS publicly announced that it was exploring strategic alternatives. Its stock price spiked 19%. Rural's stock also traded up. Shackelton, on December 20, emailed the Board with an update: "The EMS process is moving more quickly than we'd anticipated. Over the past 5 days, we have been contacted by nine private equity firms that are either interested in partnering to buy EMS or turning the tables and acquiring [Rural]." Shackelton suggested that he was "increasingly focused on engaging an advisor." To expedite the hiring process, Shackelton arranged for a call with the other members of the Special Committee, reasoning: "Since the purpose of this call will not be to evaluate and select a strategic direction, I do not believe we need the entire board to block off four hours for the banker presentations. Our only objective will be to select an advisor."

On December 23, 2010, the Special Committee interviewed Houlihan Lokey, Moelis, and RBC. The trial court found that, unlike the other firms, RBC devoted the bulk of its presentation to a sale and recommended coordinating the effort with the EMS process. RBC stated that it "recognize[d] that selling the Company today is opportunistic and that the optimal time to sell is when the interests of the seller and external market

13

factors are aligned to best maximize value. We believe that time is now[.]" RBC favored an immediate sale because the M & A environment for healthcare was "strong," Rural possessed "compelling assets" that would sell at premiums, and such quality assets were otherwise not readily available to interested buyers that played in the healthcare market. The trial court found, and the evidence indicates, that RBC only identified financial sponsors as potential bidders and suggested that an advantage of selling Rural at that period in time was that the "[d]ebt markets remain[ed] open."

By contrast, the trial court found that Moelis approached the engagement from a different standpoint. Moelis's presentation stressed its growing M & A franchise and the bulk of its presentation examined a potential combination with AMR. Moelis placed less emphasis on a sale, and noted that it would not seek to finance any of the bidders.

RBC hoped to offer staple financing to the potential buyers. The minutes of December 23 meeting reflect that the Special Committee considered the "'pros and cons' of retaining an investment banker as a financial advisor if that advisor would also seek to provide so-called 'staple financing.'" The Committee's legal counsel advised that, "if the Committee were to select RBC, the Committee would need to be especially active and vigilant in assuring the integrity of the progress [*sic*], and that it should consider appointing a second firm which would not be in a position to provide staple financing, but that would be very close to the process to assure both the fact and appearance of an appropriate and robust auction process."

The trial court found that RBC did not disclose that it planned to use its engagement as Rural's advisor to capture financing work from the bidders for EMS, and

14

the minutes do not reflect such a disclosure. Munoz's trial testimony supports this finding:

> Q. . . . Now, when going through these -- these reasons about why to initiate a sale process, did you say that RBC would use the initiation of a Rural/Metro sale process to help RBC get a role financing EMS?
>
> A. In our materials we included a discussion about, one, the financing of potential [*sic*] sale of Rural; and, two, then we also discussed the possibility of financing both the merger of both companies.
>
> Q. But did you advise the special committee, in writing or orally, that RBC would be using the initiation of a Rural/Metro sale process to help RBC get a role financing EMS?
>
> A. No.
>
> Q. At any time did you say to anybody at Rural/Metro that RBC was using its relationship with Rural/Metro as an angle to get a role financing the EMS transaction?
>
> A. We told both the management team and Mr. Shackelton that we were working with select parties on the potential financing of EMS.
>
> Q. Did you say that RBC was using its relationship with Rural/Metro as an angle to get a role financing the EMS acquisition?
>
> A. No.

On December 26, 2010, Shackelton sent an email update to the Board, noting that "the Special Committee selected RBC (as primary) and Moelis (as secondary) [advisors]." The trial court found that the Board only authorized the Special Committee to retain an advisor to analyze the range of strategic alternatives available and to make a recommendation to the Board. The email from Shackelton to the Board states: "Partner/sale process: We are continuing to refine a target list of PE firms (10-15). We have reached out informally to almost all of them over the past two weeks. Given that

15

most of the firms are currently working through the EMS sale process, it is not yet clear where their individual preferences will end up."[12]

## D. The Rural Auction Process

The trial court found that the decision to initiate a sale process in December 2010 was unreasonable at the outset because the Board did not make the decision to launch a sale process, nor did it authorize the Special Committee to start one. The trial court further concluded that the initiation of the sale process in December 2010 was unreasonable because RBC did not disclose that proceeding in parallel with the EMS process served RBC's interest in gaining a role on the financing trees of bidders for EMS. It found that RBC designed a process that favored its own interest in gaining financing work from bidders for EMS. RBC's sale process design, as the trial court observed, prioritized the EMS participants so they would include RBC in their financing trees. RBC did not disclose the disadvantages of its proposed schedule. The trial court also

---

[12] A543. The email continues:

> At this stage, we have prioritized two firms that appear to have the highest level of interest in Rural and the financial capacity to execute a transaction:
> - Apax: As of today, we have a NDA in place and this evening we connected for our first management introduction call
> - KKR: We are expected to have a NDA in place by tomorrow morning. We are planning to have a management introduction call tomorrow
> *Assuming these firms move forward, we will be sharing our projections with them over the coming week
>
> Looking forward to the week of January 3rd, we are considering the benefits of more formally reaching out to 6-12 other PE in order to gauge their level of interest in Rural (either as a partner in an AMR acquisition or an acquisition target). With this in mind, we will be working with RBC/Moelis over the next week to refine our financial model and presentation materials.

found that the Board failed to oversee the Special Committee, failed to become informed about strategic alternatives and about potential conflicts of interests faced by the advisors, and approved the merger without adequate information, including the value of not engaging in any transaction.[13]

The evidence supports these findings and reflects that RBC viewed Rural as an "angle" to obtain EMS work. RBC scheduled first round bids for late January 2011 because that tracked with the EMS process and Rural's ability "to act as an 'angle.'" RBC hoped to generate up to $60.1 million in fees from the Rural and EMS deals. The maximum financing fees of $55 million were more than ten times the advisory fee.

The record also indicates that there were identifiable benefits to initiating a sale process in December 2010, as the trial court noted. By January 2011, Rural's stock price was up 143% since 2010 and trading at a 5-year high, the EBITDA multiples in the emergency medical transport sector had expanded, financial sponsors were interested in participating in the space, and the leverage finance markets were supporting equity valuations in the industry.

Despite the potential advantages of running the sale process in early 2011, the trial court found that Rural encountered readily foreseeable problems associated with trying to induce financial buyers to engage in two parallel processes for targets that were direct competitors. The challenges regarding protection of Rural's confidential information and coordinating schedules with EMS bidders were raised for the first time on February 6, 2011, at a meeting of the Special Committee. The trial court found that the Special

---

[13] We similarly refer to claims involving the sale process as the "Sale Process Claim."

Committee had not previously considered this complication. With respect to the issues concerning the terms of standard confidentiality agreements, the Court of Chancery asked Munoz at trial:

> Q:  . . . It seems to me that this type of information sharing issue, which comes up whenever you do a process that involves potential competitors, would have been something that you all would have anticipated when you originally contemplated the spin/merge process when you were recommending the two-track structure. Was it?
>
> A:  Yes.[14]

RBC was aware that the Rural confidentiality agreement contained a no-conflict provision that prohibited recipients of Rural's confidential information from sharing it with individuals involved in the EMS process.[15] The no-conflict provision provided: "natural persons participating in the discussions with the recipient in connection with the potential negotiated transaction have not been, are not, and will not be participating in a potential financing of an acquisition or other similar transaction involving EMS or AMR."[16] The confidentiality agreement then required the recipient to confirm in writing that the no-conflict provision was satisfied.

---

[14] A2145.

[15] At trial, Munoz testified as follows:

> Q.  Now, moving back a couple months to January, for purposes of getting bidders to accept staple financing from RBC, you suggested to the financial -- your financial sponsor colleague, banker colleague, to remind their financial sponsors that the confidentiality agreements they signed forbid them from sharing Rural/Metro confidential information to [*sic*] other financing sources; right?
>
> A.  That is correct, yes.

A2097.

[16] A2097-98.

18

RBC developed a two-track bidding process, with the first classification of buyers constituted primarily of those participating in the EMS process and the second grouping generally composed of "those that have dropped out of the EMS process and/or [those that] have/should have interest in [Rural] as a standalone deal . . . ."[17] During December 2010 and January 2011, with the Special Committee's approval, RBC and Moelis contacted 28 potentially interested parties. In late January 2011, RBC distributed a bid instruction letter to the twenty-one private equity firms that signed confidentiality agreements. The full Board had not met since December 8, 2010. The Special Committee had not met since December 23. Six parties submitted indications of interest, ranging between $14.50 and $19.00 per share. RBC and Moelis apprised the Special Committee of the reasons parties dropped out of the auction process, including two who could not justify a price above the stock's trading value. Later, Munoz contacted Shackelton, informing him as follows: "Fyi – Thoma Bravo out. Said they can't get to current stock price."

In late December 2010 and early January 2011, participants in the process provided negative feedback about its timing and design. As the auction developed, Moelis's concerns regarding transaction complexity were realized; Harding, the Rural point person for Moelis, commented that a potential bidder for Rural, KKR, suggested it "would be tough" to participate in "simultanous [*sic*] auctions."[18] Moreover, KKR told Rural's bankers that it "would be ideal" if the EMS deal and the Company's deal were

---

[17] A544.
[18] B136.

"stagger[ed]." After speaking with Bain Capital Partners, LLC ("Bain"), Harding shared with Shackelton and RBC that the private equity firm also thought that "lining up two deals for public companies simultaneously is tough but staggered, even fairly closely, could work[.]" Clayton, Dubilier & Rice ("CD & R"), a private equity firm, also urged delaying the Rural process until the EMS sale was completed.

On January 24, 2011, DiMino met with a team from J.P. Morgan, which recommended that Rural execute on its growth plan over the next year. J.P. Morgan saw Rural poised at an "[i]nflection [p]oint" in which the Company was transitioning from turnaround to early-stage growth story. J.P. Morgan's presentation to Rural's CEO fundamentally challenged the central, "sell now" thesis of RBC.[19] It hesitated to recommend an immediate sale because "logical strategic buyers" at the time were concentrating on change of control transactions of their own. J.P. Morgan also recommended Rural continue to execute on its "growth plan," as doing so would drive further stock price appreciation. It advised DiMino that allowing the healthcare market to play out, in the meantime, would enable Rural to attract greater interest from financial sponsors and strategic buyers. In sum, it suggested that a Rural sale would likely be better accomplished at a different point in time, in view of the fact that strategic bidders were then "internally focused" and the Company had "significant growth to unlock." DiMino limited his distribution of the presentation to Shackelton and Munoz, noting: J.P. Morgan "had some interesting comments regarding the AMR process and our potential

---

[19] J.P. Morgan observed that, if Rural "execute[d] on [its] growth plan," there would be "significant interest to come," particularly in light of the fact that strategic bidders were, at the time, "focused internally[.]" B150.

20

attractiveness to private equity firms. I didn't tell them we had launched our own go-private process."[20]

The Board did not schedule a meeting to review the indications of interest or discuss next steps. The Special Committee met on February 6, 2011. RBC made a presentation that did not include any valuation metrics. At the meeting, where Conrad, DiMino, and Wilson were also present, RBC and Moelis reviewed the six indications of interest received following the auction process. The minutes indicate that, after receiving the confidential information memorandum, "14 firms declined to participate. In addition, one private equity firm, [Bain], indicated that the level of its interest in pursuing the transaction with [Rural] would depend on the results" of its participation in the EMS process. A joint presentation by RBC and Moelis summarized the initial indications of interest:

> American Securities — $16.00—$17.00;
>
> Ares Management — $14.50—$16.50;
>
> CD & R — $15.50—$16.50;
>
> Leonard, Green & Partners — $17.00—$19.00;
>
> Kelso & Company — $14.75—$16.50; and
>
> Warburg — $17.00.

RBC's presentation to the Special Committee at the February 6 meeting was four pages long, provided no opinion, preliminarily or otherwise, on the quality of the bids, and, as the Court of Chancery observed, failed to include any valuation metrics.

---

[20] B144.

The trial court concluded that, while the minutes reflect that Shackelton asked Davis and Walker whether to include all six private equity firms in the next phase, Shackelton and RBC already had agreed to make a data room available to all bidders beginning the next day, February 7, and had scheduled meetings with all six firms to take place between February 9 and 18. DiMino privately contacted RBC in search of valuation metrics. According to the trial court, RBC gave DiMino a two-page analysis showing that at prices of up to $18 per share, an LBO would generate five year internal rates of return for a financial sponsor that exceeded 20%. On February 8, Munoz provided DiMino with a deck regarding leveraged buyout returns, evidencing five year internal rates of return over 20% for offers exceeding $15.50 per share.

The Special Committee met again on February 22, 2011. RBC made a limited presentation, which included no valuation metrics and which was followed by a discussion of CD & R's potential participation in the Rural process. The Special Committee identified CD & R, after it won the EMS sale, "as a competitor of the Company, causing certain confidentiality and antitrust issues to be considerations[,]" if the private equity firm participated in the Rural process.[21] DiMino testified at trial that, at this meeting, he was "very concerned" about confidentiality with respect to CD & R. He continued by elaborating on that point as follows:

---

[21] Additionally, during an executive session of the meeting, without RBC or Moelis present, legal counsel discussed the Court of Chancery's holding in the case of *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del. Ch. 2011). At trial, DiMino testified that he was aware of legal counsel's advice that, in light of RBC's interest in stapled financing, the directors "be actively involved in the process in order to assure that there is neither an actual problem with regard to the conflict of interest, nor the appearance of a defective process as a result of this conflict of interest . . . ." A2212.

Because if [CD & R] got to the full management presentation or they got to get all the information that we would normally give in the management presentation and in the data room, some of those things could be counterproductive if they didn't buy -- if they ultimately didn't buy us. They would have trade secrets or some of our secret sauce, if you will, that we had developed.[22]

DiMino testified further that this concern about confidentiality was present when the Company first launched the sale process.

The trial court found that, although RBC previously had recommended a near-term sale process to capture the interest of the winner of the EMS auction, the Special Committee now balked at having CD & R participate. The Special Committee set a bid deadline of March 21 and decided not to solicit interest from strategic acquirers. As the bid date approached, CD & R suggested to RBC that it could outbid other sponsors for Rural because of synergies with AMR. CD & R asked for the bid deadline to be pushed back to April, so that it could formulate its bid.

On March 15, 2011, the Board met to consider the Special Committee's progress for the first time since December 8, 2010.[23] The minutes reflect that representatives of RBC and Moelis made a presentation to the Board "regarding the ongoing exploration of the potential sale of the Company" and reviewed the "next steps" in the "sale evaluation process." Daniel made the presentation to the Board on behalf of RBC. Akin to its previous presentations, RBC failed to include valuation metrics and provided no opinion,

---

[22] A2232.

[23] The trial court found that the minutes prepared in connection with the March 15 meeting "have the feel of a document drafted in anticipation of litigation, and the rose-colored description of the sale process that appears in the minutes does not match up with what actually took place." *Rural I*, 88 A.3d at 72.

preliminarily or otherwise, on the quality of the bids during its March 15, 2011 sale process update.

Further, the minutes of the March 15 meeting suggest that RBC and Moelis "commented upon the detailed oversight provided by the Special Committee of independent directors throughout the process, noting frequent formal and informal communications involving the full committee or its chair (Mr. Shackelton)." RBC, at the meeting, also remarked upon the "formal meetings of the Special Committee that were held during the process." Shackelton suggested that "the full Board had been updated from time to time at key points in the process."

The trial court found, however, that the description of the process in the minutes was "false," in that the record presented to it contained evidence of only two formal meetings of the Special Committee: one on February 6, 2011 and one on February 22, 2011. According to the trial court, Davis was largely an absentee director and Walker deferred to Shackelton, who drove the process. Again, RBC does not plainly argue that these findings are clearly erroneous and, even if it did, we find no basis for such a conclusion.

At the March 15 meeting of the Board, RBC and Moelis discussed the final bid deadline of March 21, 2011. The trial court found that RBC had designed the sale process ostensibly to give the winner of the EMS auction the opportunity to make a bid for Rural that included synergies. It determined that neither the Board nor the Special Committee considered the benefits that could inure to Rural's advantage if the winner of the EMS process then sought to acquire Rural, because Rural could seek to extract a

24

portion of the synergies from a combination of AMR and Rural in the form of a higher price.

CD & R, the private equity firm that won the bidding process for EMS and one of the Company's six suitors, was a topic of discussion for the Rural directors on March 15. CD & R had advised RBC and Moelis that it would be unable to complete its due diligence and other review processes with respect to Rural until the completion of its acquisition of EMS, and that any bid it might submit would be conditioned accordingly. The minutes suggest that the Board discussed the following with respect to CD & R:

> [T]he potential for a higher purchase price from CD&R relative to other bidders due to the potential synergies that could be realized between [Rural] and AMR under common ownership by CD&R; a possible delay in the March 21 deadline to accommodate CD&R and the impact on the enthusiasm of other potential bidders if the reason for the delay became known; the risk to [Rural's] sale process of waiting for CD&R in view of the timing for the other potential bidders; the potential for dealing with CD&R via a "go-shop," "fiduciary out" linked to a reasonable break-up fee, or other contractual provisions . . . .

On the advice of RBC, Moelis, and legal counsel, the Board "concluded it was in the best interests of the Company to proceed with a bid deadline of March 21, and that CD&R would be encouraged by the Company's financial advisors to submit its best and final bid at that time." A March 15, 2011 RBC presentation to the Board reflects that CD & R communicated that it would not participate further in the Rural sale "due to its involvement in the EMS process[.]"

The trial court found that RBC's faulty design prevented the emergence of the type of competitive dynamic among multiple bidders that is necessary for reliable price discovery. Because Warburg had withdrawn from the EMS process, it was able to pursue

25

Rural aggressively, thus giving Warburg an advantage over others who were still involved in evaluating EMS. The trial court concluded that Warburg knew that its competitors in the process lacked similar resources and that it did not need to incorporate as much of its anticipated gains in its price to outbid the other firms. Carney referred to the private equity firm's challengers for the Rural acquisition as a "motley group because the EMS process put so many of the larger firms on the sidelines."[24]

In addition to the competitive design issues faced by prospective financial buyers, the evidence indicates that strategic buyers were preoccupied. The March 15 minutes state: "Generally speaking, it was noted that it was unlikely that any potential strategic purchaser not affiliated with a private equity firm would have an interest in the ability [*sic*] to enter into a transaction on terms acceptable to the Company."[25] J.P. Morgan's presentation to DiMino commented that "[t]he three other strategics are focused internally now[.]"[26] Thus, the competitive dynamic was inhibited by the fact that potential strategic bidders for Rural were themselves tied up in change of control transactions at the time the Company was exploring a sale. The Board decided to proceed without reaching out to Falck A/S, a European company with an equity interest in Rural and a potential strategic bidder. The Board also decided not to extend the bid deadline.[27]

---

[24] B251.

[25] A616-17.

[26] J.P. Morgan's presentation suggested that EMS, AirMedical Group Holdings, and Air Methods were potential strategic acquirers. B150.

[27] After the meeting, RBC told the remaining bidders that the timeline would not be extended, although Rural pushed the deadline out by 24 hours to March 22.

The Board then adopted a resolution which the trial court characterized as "granting the Special Committee the authority that Shackelton and RBC had assumed for themselves."[28]  It states:

> **NOW THEREFORE, BE IT RESOLVED,** the Board of Directors hereby ratifies and restates its delegation to the Special Committee of the exclusive power and authority to (i) determine whether a Potential Transaction is or may be, at this time, in the best interests of the Company and its stockholders, and report its recommendations to the full Board of Directors, (ii) retain and work with outside advisors in a controlled and contained process to seek from various financial institutions indications of interest and possible transaction terms in respect of a Potential Transaction, (iii) review and evaluate the terms and conditions of such indications of interest and determine the advisability of advancing further in respect of such proposals and/or whether other strategic alternatives in respect of the Company should be explored, (iv) if it deems appropriate, solicit proposals for a Potential Transaction that would be in the best interests of the Company's stockholders, (v) negotiate and finalize terms of any such Potential Transaction and, and [*sic*] (vi) report its findings and recommendations to the full Board of Directors[.]

## E.  RBC's Efforts to Secure Staple Financing and Warburg's Final Bid

Rural's Engagement Letter with RBC and Moelis contains its most specific disclosures with respect to RBC's buy-side financing ambitions in Section 2, which is entitled, "Certain Agreements of the Company."  Section 2.d) expressly provides that "RBC shall have the sole and exclusive right to offer stapled financing to, and arrange stapled financing for, any potential purchaser in a Sale Transaction, if the Board of Directors or a special committee of the Board of Directors deems it desirable to offer stapled financing to potential purchasers."[29]  This language, however, does not capture

---

[28] *Rural I*, 88 A.3d at 73.
[29] A553.  This provision of the Engagement Letter further provides:

27

2.d) Additionally, in connection with an AMR Acquisition Transaction or Alternative AMR Acquisition Transaction, RBC shall have the right to participate in the provision of any and all debt financings, on mutually acceptable terms, as appropriate, required for the completion of such Transaction, and shall have the opportunity to present credentials to the Board of Directors and senior management of the Company with a view toward being appointed to have a lead role in the underwriting, bookrunning, placing, managing or leading of various elements of such financing, as appropriate.

*Id.* The Engagement Letter defines an "AMR Acquisition Transaction" as:

[A]ny merger, consolidation or other business combination or acquisition transaction pursuant to which the Company is to acquire all or a majority of, or be combined with, American Medical Response, Inc. ("*AMR*"), or all or a majority of its business. For the avoidance of doubt, an AMR Acquisition Transaction shall not include a Sale Transaction or an Alternative AMR Acquisition Transaction.

A560. The Engagement Letter defines an "Alternative AMR Acquisition Transaction" as:

[A]ny merger, consolidation or other business transaction with respect to which the Company participates in conjunction with one or more other entities and which involves a merger, consolidation or other business combination or acquisition transaction pursuant to which the business and assets of Emergency Medical Services Corporation, the parent company of AMR, undergoes a change in control and the result of which is that the business and assets of AMR are combined with, or operated under a common management structure which includes, the Company. For the avoidance of doubt, an Alternative AMR Acquisition Transaction shall not include a Sale Transaction or an AMR Acquisition Transaction.

*Id.* The Engagement Letter defines a "Sale Transaction" as:

[A]ny (i) merger, consolidation, or other business combination transaction pursuant to which the Company is to be acquired by, or combined with, another entity, (ii) any sale or disposition by the Company of an interest in material assets of the Company, or (iii) any recapitalization, restructuring, or other transaction or series of transactions involving the sale or disposition of capital stock of or other equity interest in the Company which has the effect of transferring a majority in interest or control of the Company. For the avoidance of doubt, a Sale Transaction shall not include an AMR Acquisition Transaction or an Alternative AMR Acquisition Transaction.

*Id.* Notably, these definitions all contemplate a transaction involving the Company—not transactions that are not inclusive of the Company.

28

RBC's provision of financing to an acquirer of EMS in a transaction that does not involve Rural.

Further, in Section 2.f), the Engagement Letter's disclosures with respect to the EMS process provide that "RBC and Moelis shall have the sole and exclusive right to provide certain investment banking and financial advisory services with respect to an acquisition or combination transaction with respect to [EMS] or EmCare Holdings Inc., other than an Alternative AMR Acquisition Transaction." This language refers to RBC's possible participation in a transaction between Rural and EMS, but does not expressly touch upon RBC's buy-side role in any EMS transaction not inclusive of Rural.[30]

The Engagement Letter, in Section 9 entitled, "Other Matters Relating to Engagement," sets forth generic and boilerplate disclosures with respect to the provision of financial products by both RBC and Moelis. In part, it provides that RBC "may also provide a broad range of normal course financial products and services to [its] customers" and "may arrange and extend acquisition financing or other financing to purchasers that may seek to acquire the Company and/or to the same or different purchasers that may seek to acquire companies or businesses that offer products and

---

[30] This provision of the Engagement Letter further provides:

> The terms and conditions relating to any such services will be outlined in a separate proposal and the fees for such services will be in addition to fees payable hereunder. Any such proposal will be negotiated separately and in good faith, set forth in a separate written agreement, and be consistent with prevailing industry practice. Notwithstanding the foregoing, any fees resulting from such advisory services shall be paid in the following manner: 60% of the fee will be paid directly to RBC and 40% of the fee will be paid directly to Moelis.

A554.

services that may be substantially similar to those offered by the Company."  Section 9 fails to specifically state that RBC would seek to leverage its Rural engagement to provide financing in a separate EMS transaction, nor does it disclose that RBC would favor its interests as a lender over those of the Company.  As to Section 9, the trial court held that, "[t]his generalized acknowledgment that RBC . . . might extend acquisition financing to other firms did not amount to a non-reliance disclaimer that would waive or preclude a claim against RBC for failing to inform the Board about specific conflicts of interest."[31]

Section 4 of the Engagement Letter sets forth the agreement as to the compensation to be paid to RBC and Moelis for their services.  For its fairness opinion, RBC was entitled to $500,000, payable upon the delivery of the opinion, "without regard to the conclusion reached in such opinion or whether such opinion [was] accepted or a Transaction [was] consummated."[32]  The fairness opinion fee was to be credited against any transaction fee.

Under Section 4, the Engagement Letter provided for various transaction fees.  First, the Engagement Letter provided for a Sale Transaction Fee:

> In the event the Company consummates at any time a Sale Transaction pursuant to a definitive agreement or letter of intent or other evidence of commitment entered into (i) during the Term, or (ii) during the nine (9)

---

[31] *Rural I*, 88 A.3d at 101 (citation omitted).

[32] A555; Engagement Letter § 4.b).  The Engagement Letter, in Section 4.c), also provided for an Announcement Fee:  "In the event that . . . the Board of Directors requests a fairness opinion from either, but not both of, RBC or Moelis, an announcement fee ("*Announcement Fee*") of $500,000 shall be payable to the Advisor . . . from which a fairness opinion has not been requested."  *Id.*  The Announcement Fee was to be credited against the transaction fee or the termination fee for any transaction related to the Engagement Letter.  *Id.*

months following the Term, the Company agrees to pay RBC and Moelis a total transaction fee . . . equal to the sum of (A) 1.00% of the Aggregate Transaction Value . . . to the extent that the price to be paid to stockholders of the Company is at or below $16.00 per share, and, in addition, (B) 3.0% of the Aggregate Transaction Value to the extent related to the price to be paid to stockholders of the Company in excess of $16.00 per share.[33]

The Sale Transaction Fee was to be paid at closing in the following manner: "60% of the fee will be paid directly to RBC and 40% of the fee will be paid directly to Moelis."

Second, if Rural consummated, at any time, an AMR Acquisition Transaction pursuant to an agreement entered into during a specified time period, the Company agreed to pay RBC and Moelis $3,500,000. Another provision addressed a transaction fee payable in the event Rural consummated an Alternative AMR Acquisition Transction.

Third, if the Company received a break-up fee or other termination fee in connection with a Sale Transaction, Rural agreed to pay RBC and Moelis 20% of the break-up or termination fee received by the Company. Like the other fees, 60% was payable directly to RBC and 40% was payable directly to Moelis. Thus, with the exceptions of the fairness opinion fee and termination fee, the fees that RBC and Moelis were to receive were contingent upon the Company consummating a transaction.

On March 18, 2011, RBC sent Warburg executed commitment papers, but Warburg did not respond. The trial court found that, on the day before the merger was approved, RBC's most senior bankers made a final push to obtain Warburg's financing business. The evidence clearly supports the trial court's findings. For example, a contemporaneous RBC internal memorandum documented that the bank's "[d]eal team

---

[33] A555; Engagement Letter § 4.d) (alternations removed).

31

[was] working with Warburg Pincus on a final round bid." The memorandum continued: "Other banks potentially providing papers to our sponsor include [Credit Suisse Securities (USA) LLC], Jeffries [Finance LLC] and [Citigroup Global Markets Inc.]"

As part of its push to secure Warburg's business, RBC bankers sought internal approval to underwrite 100% of a $590 million financing package for Warburg. RBC's bankers stated the following in their memorandum regarding the Rural deal:

> [Warburg], covered by David Daniels, is a top tier client of the Financial Sponsors Group. RBC has an active dialogue with [Warburg] across all of its industry verticals and has generated [approximately] $6mm in fees from deals with this sponsor. We are supporting the proposed financing commitment associated with the purchase of [Rural] as it will further strengthen our relationship and lead to additional deal flow with [Warburg].

Before the bid deadline, Carney emailed a Warburg colleague with an update on the Rural process: "I think we are in a good position. [DiMino] likes us a lot, the bankers are pulling for us, and we are the premier firm involved in the process."[34]

On the extended bidding deadline of March 22, 2011, Warburg submitted a bid at $17.00 per share, and CD & R submitted an indication of interest at $17.00 per share, subject to further diligence. American Securities "indicated that their current valuation was below their initial indication of interest on February 1, 2011 of $16.00 to $17.00 per share and that they expected remaining diligence would take approximately 2-3 weeks[.]"[35]

On March 23, the Special Committee met to discuss the offers received from Warburg and CD & R. Conrad, Holland, DiMino, Wilson, RBC, and Moelis were also

---

[34] B251.
[35] A834.

present at the meeting by invitation. Munoz and his colleagues at RBC debated whether to provide valuation materials to the Special Committee to enable them to evaluate the bids. Munoz was worried that RBC would be asked about valuation.

The trial court found that, with bids in hand, the relationship between RBC and Shackelton changed. Before the bids, they shared the goal of wanting the Company sold. But Shackelton wanted more than $17.00 per share, and RBC "just wanted a deal." At this point, DiMino became RBC's "principal ally" in the boardroom. Like RBC, DiMino had an incentive to sell the Company and continue managing it for Warburg. As evidence of this, in advance of the Special Committee meeting, Munoz scheduled a call with Shackelton to "manage him."[36]

The trial court determined that the Special Committee decided not to engage further with CD & R, and that "[t]he Special Committee directed RBC and Moelis to engage in final negotiations with Warburg over price."[37] RBC reviewed the offers with the Special Committee on March 23, 2011. "Warburg's offer constituted a proposal to acquire all of the Company's outstanding common stock for $17 per share, with no further confirmatory due diligence. Along with its offer, Warburg had submitted fully committed equity and debt commitment letters . . . ."[38] With respect to CD & R, the minutes reflect that RBC represented to the Special Committee that the private equity firm's "offer constituted a proposal to acquire all of the outstanding Company Common Stock for $17 per share, subject to confirmatory due diligence. CD&R's offer letter

---

[36] B285.
[37] *Rural I*, 88 A.3d at 76.
[38] A804.

reiterated its previous statements to RBC and Moelis that CD&R was unable to fully commit to a definitive transaction to acquire [Rural] until the closing of its acquisition of [EMS] . . . ."[39]

The Special Committee ultimately rejected the proposals received from Warburg and CD & R. The minutes do not reflect a discussion of valuation or the design of the sale process. The trial court observed that the Board had no valuation materials beyond a one-page transaction summary that compared the metrics implied by a $17.00 per share offer to the metrics implied by Rural's closing market price of $12.38 on the prior day. According to the minutes, Shackelton, Davis, and Walker proceeded on that basis as follows:

> [T]he Special Committee determined that the purported offer from CD&R did not provide the Company any certainty of a successful transaction, and did not otherwise present a compelling case for pursuing a transaction with CD&R at this time, given that it did not have committed financing and that it did not provide any indication of the merger agreement terms it would require. The Special Committee directed RBC and Moelis to contact Warburg to engage in further negotiations to improve its offer in terms of the price to be paid to the stockholders of the Company . . . .[40]

The trial court found that RBC "encouraged DiMino to drum up director support for Warburg's bid" and presented a board book "designed to convince [the Board] to accept Warburg's bid . . . ."[41] RBC's internal communications before the March 23 meeting of the Special Committee reflect the bank's position that closing on the Warburg offer and obtaining the private equity firm's buy-side financing business were its

---

[39] *Id.*
[40] A805.
[41] *Rural I*, 88 A.3d at 96.

priorities when advising the Board. Munoz emailed his RBC colleagues on March 23: "Let's all plan to do a call w/ Shackelton before [the] Board call. Need to send him the 1-2 [valuation] pages we discussed to him [*sic*] before we get on [the] phone. Need to manage him before he gets on w/ [the] Board."[42] On March 24, Munoz emailed Daniel: "Told dimino to start working the board. He said he'll start calling each of them tomorrow."[43] Munoz also emailed DiMino: "Focus on [the] board today. Let me know if you need more tidbits to help you. Once again, last time [Rural's] stock was at $17 was in 1998."[44]

Shackelton contacted Carney, the head of Warburg's acquisition team, on March 25, 2011. Carney shared with a colleague, Elizabeth "Bess" Weatherman, the following: "The Chairman (who I gather is in his early 30s) and I just spoke for 15 minutes. Pleasant tone. He offered to drop the Go Shop, give us a voting agreement, and move a bit on the break-up fee if we agreed to bump to $17.50. I declined."[45] Carney concluded his sale process update to Weatherman by remarking: "I know [Rural's] bankers are now nervous and want to get something done."[46]

On March 25, Warburg increased its bid to $17.25 per share. Warburg's bid materials did not include staple financing from RBC.[47]

---

[42] B285.
[43] B286.
[44] B287.
[45] B291.
[46] *Id.*
[47] Warburg's March 22 bid included three commitment letters, one from each of Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., and Jeffries Finance LLC. Collectively, the commitment letters provided Warburg with 100% financing for the transaction.

Following Warburg's submission of its bid, RBC did not disclose to its client that it continued to seek a buy-side financing role with the private equity firm. As to the Board, the trial court concluded that "[t]he Rural directors did not provide any guidance about when staple financing discussions should start or cease, made no inquiries on that subject, and imposed no practical check on RBC's interest in maximizing fees." For example, DiMino was asked at trial:

> Q. Now, between this date, December 23rd, and early February, do you recall a single conversation you had with Mr. Munoz or anyone else at RBC in which you specifically discussed with them what they were doing with regard to achieving staple financing from -- from any potential buyer of RBC [*sic*]?
>
> A. No.[48]

In his deposition testimony, Carney confirmed that RBC continued to push for Warburg's financing business, even after Warburg's bid excluded the bank's commitment papers:

> Q. And at some subsequent date did RBC express interest -- continued interest in offering debt financing to Warburg Pincus?
>
> A. As I recall, yes.
>
> Q. And what do you recall of the nature of that expression of interest by RBC?
>
> A. My recollection is that RBC was just -- was trying to find a way to participate in the debt financing somehow.
>
> . . .
>
> Q. . . . And was there any subsequent discussion with RBC, perhaps more definitive or more following up, on a subsequent date?

---

[48] A2211-12.

A. . . . I do recall that we had additional conversations with RBC because they continued to try to find a way into the financing, and we continued to tell them that that was not going to happen.[49]

When directed by the Special Committee to engage in final price negotiations with Warburg, RBC again did not disclose that it was continuing to seek a buy-side financing role with Warburg. On Saturday, March 26, 2011, senior bankers at RBC continued to press Warburg to include RBC in the financing package.[50] Munoz testified at trial as follows:

Q. . . . So the most senior people at RBC are trying to make a last effort to see whether RBC can get involved in the staple on Saturday, March 26th; correct?

A. Yes.[51]

Blair Fleming, RBC's Head of U.S. Investment Banking, as an inducement, offered to have RBC fund a $65 million revolver for a different Warburg portfolio company.[52] Later, in an email to Munoz, Fleming stated: "I'm gonna call warburg myself. We just committed 65 to their effing revolver."[53]

### F. RBC's Manipulation of the Valuation Process

On Saturday, March 26, 2011, the RBC fairness opinion committee met to discuss Warburg's bid for Rural. In addition to Daniel and Munoz, several members of the RBC deal team attended the meeting. Ali Akbar and Allen Morton, along with Daniel, served

---

[49] B610.
[50] A2192-93.
[51] *Id.*
[52] A2192; B329.
[53] B326.

on the "committee." Morton "had previously been the head of M&A at RBC U.S., and . . . Akbar, [was a] managing director in the M&A group."[54] The committee members reviewed the fairness presentation and letter, and "recommended certain changes" to the same.[55]

The record evidence supports the trial court's factual finding that, on the deal front, RBC worked to lower the analyses in its fairness presentation so Warburg's bid looked more attractive. Specifically, the trial court found that RBC made a series of changes to its fairness analysis. First, RBC decided not to rely on the single comparable company for valuation purposes. The record evidence reflects that RBC's preliminary fairness opinion deck applied peer group trading multiples to various valuation metrics. In the final draft of the fairness presentation, however, RBC represented to the Board that it "[d]id not rely on comparable company analysis for valuation purposes." The comparable company analysis nevertheless remained in the fairness materials, although it was removed from the valuation football field.[56]

Second, the trial court found that RBC modified its precedent transaction analysis by reducing the low end multiple used in both the management case and "consensus" case, with the effect being that the alteration lowered the bottom end of the management

[54] A2403. At the time of the transaction, RBC's fairness committee formation process was *ad hoc*, such that "anyone who was a managing director in the M&A group could serve on the fairness committee. And each time there was a fairness opinion to be discussed, [RBC] needed to have at least two independent members, independent meaning the non-sponsoring member . . . ." *Id*. Daniel was the sponsor, and Morton and Akbar were the "independent members." *Id*. Akbar had never served on a fairness committee.

[55] A824; A2124.

[56] Valuation football fields are used to summarize valuation ranges in connection with business combinations. Typically, they provide the valuation ranges corresponding to each of the valuation methodologies used for a given M & A transaction.

case precedent transaction range and "consensus" case precedent transaction range. The morning draft of the fairness opinion presentation used a multiple range of 7.5x to 9.5x, implying a low end per share valuation of $15.49 for the management case. The afternoon draft that was ultimately presented to the Board used a range of 6.3x to 9.5x, resulting in a low end per share valuation of $11.54 for the management case. The trial court also found that, on the morning of Saturday, March 26, 2011, "the 'consensus' precedent transaction range was $13.31 to $19.15. On Saturday afternoon, it was $8.19 to $16.71, entirely below the deal price." In altering its analysis, RBC decided to weigh heavily the 2004 acquisition of AMR by Onex Partners at 6.3x EBITDA, a course of action it had discredited earlier. The trial court observed that this change was inconsistent with RBC's December 2010 pitch book, where RBC assigned AMR a low-end multiple of 8.0x and suggested that Rural pay 8.4x for AMR. This change was also inconsistent with RBC's view, expressed throughout the sale process, that Rural's operating metrics were objectively superior to AMR's.

Finally, the trial court determined that RBC lowered the "consensus" Adjusted EBITDA for 2010 from $76.5 million to $69.8 million to make the Warburg "deal look more attractive."[57] In material presented to the Board before it had the March offer from Warburg in hand, RBC added back approximately $6.3 million in certain one-time expenses when calculating Rural's Adjusted EBITDA for 2010. The preliminary draft of the fairness opinion presentation contained a Consensus Adjusted EBITDA figure of $76.5 million and, in a footnote, RBC noted that "EBITDA is adjusted for stock based

[57] *Rural I*, 88 A.3d at 77.

39

[*sic*] compensation, gain on sale of assets and one time [*sic*] expenses."[58]  The morning draft also suggested that "[c]onsensus pro forma adjustments would be unlikely" to account for certain of the one-time expenses.[59]  The final fairness presentation deck stated that "Wall Street research analysts covering [Rural] do not make pro forma adjustments[.]"[60]  The Consensus Adjusted EBITDA figure in the final draft was $69.8 million.[61]

Munoz, in the lead up to finalizing the fairness opinion presentation, emailed his colleagues saying that RBC would "need to add some bullets that say Wall Street analyst [*sic*] do not reflect any of these one-time expenses.  Something to explain why we are not adjusting[.]"[62]  Similarly, after receiving the fairness opinion deck, Daniel had several questions with respect to the valuation analysis.  In a message to Munoz and other RBC bankers with comments to the initial draft of the fairness presentation, he noted:

> 10:  I thought we were looking @ an ebitda multiple around 9.0.  What's changed?
>
> 20:  maybe it's just because I'm tired but I think it's confusing in terms of what ebitda we're applying. . . .  This isn't reader friendly enough.
>
> 21/22:  I'd like thoughts on why there's [*sic*] no qualitative comments here.  I know our internal discussions + justification.  But for a new reader, the fact that we only have 1 comp and that the most recent precedents are

---

[58] B305.
[59] B316.
[60] A873.
[61] *Id.*  The evidence shows that certain Wall Street firms suggested that one-time expenses needed to be added back and others chose to exclude those expenses when calculating the 2010 Adjusted EBITDA for the Company, although those that refrained from adding the expenses back generally noted the one-time adjustments in the text, as RBC acknowledges.  Thus, we do not find the trial court's factual determinations to be clearly erroneous.
[62] B327.

higher than our deal raises issues. While I know we will explain to [the Board and Special Committee], is there a reason why we don't do so in the text. [*sic*][63]

The record reveals that Munoz coordinated between the senior RBC bankers lobbying Warburg and the RBC deal team working on the fairness opinion, but he did not disclose RBC's activities to the Board. Further, the trial court found that RBC "failed to provide Rural's Board or the Special Committee with a preliminary valuation analysis" for three months.[64] The trial court noted that, in fact, beyond the December 2010 RBC pitch book—which contained materially different analyses and which only the Special Committee was privy to—the Board had not seen valuation materials before March 27, 2011.[65] The evidence supports the Court of Chancery's conclusions. The investment bankers were well aware that they "had not provided any preliminary valuation analysis since December 23, 2010, and had only provided [the] December 23 book to the Special Committee,"[66] as opposed to the entirety of the Board. Munoz testified at trial as follows:

> Q.    And isn't it the case, sir, that it was not until Sunday night, March 27th, that RBC delivered to Rural/Metro's board or special committee a DCF analysis of the management projections that had been sent to the bidders back in January?
>
> A.    We did -- that was the -- we did a DCF in December and, yes, the next time we did a DCF was, yes, at that time; right.

---

[63] B293.

[64] *Rural I*, 88 A.3d at 95.

[65] *Id.* The trial court found that the December pitch book showed that Rural's value on a stand-alone basis exceeded what a private equity bidder willingly would pay for the Company. It found that the evidence at trial established that the value of Rural as a going concern exceeded what the stockholders received in the merger.

[66] *Id.* at 100.

Q.     Next time you did a DCF after that pitch book on December 23rd was on March 27th, 2011; correct?

A.     Yes.  That's all that the company asked and requested, yes."[67]

Before the meeting at which the Board resolved to sell the Company, Munoz shared with his RBC colleagues:  "I'm worried that someone will . . . ask about our views on [Rural] valuation."[68]  In a March 23 email thread with his banking colleagues, the RBC Managing Director reiterated that he was "afraid [the] board will ask us of our high level views [on valuation] today."[69]  After Daniel told Munoz that RBC had not planned on providing valuation materials that day, Munoz repeated:  "Ok.  But we will be asked and to convince [S]hackelton we need to show valuation.  Perhaps we just put together 2-3 pages and just send to [S]hackelton[.]"[70]

The trial court found that, in performing its DCF analysis, RBC used an exit multiple range of 7.0x to 8.0x, which did not match up with the range used for RBC's precedent transaction analysis.  On the basis of that exit multiple range, RBC's DCF analysis in the preliminary fairness opinion deck reflected a range of $16.49 per share to

---

[67] A2107-08.  Munoz continued:

> Q.     . . . And then with that caveat of sharing the EMS transaction multiple, did you actually share a precedent transaction analysis or a comparable company analysis between December 24th and March 26th?
>
> A.     The only thing I believe we shared during that time frame was the EMS transaction.  We did not share both a comparable and a precedent.

A2108.
[68] B252.
[69] B284.
[70] *Id.*

$21.35 per share.[71] When Munoz saw the DCF analysis during the afternoon of March 26, he emailed his RBC colleagues: "I thought we were going to try to reduce dcf?"[72] RBC's final DCF analysis reflected a range of $16.28 per share to $21.07 per share. Notably, the LBO analysis deck, dated February 9, 2011, which was provided to DiMino by RBC, employed an exit multiple range of 7.8x to 8.3x.

On March 26, RBC's *ad hoc* committee "approved the fairness opinion presentation and letter via email and verified that the opinion could be delivered to" Rural's Board that day.[73] RBC's one-page document memorializing the meeting suggests that "[a]fter making the suggested changes and receiving approval from outside legal counsel, the deal team notified the committee of the revised fairness opinion presentation and letter via email."[74] Morton and Akbar, however, provided limited oversight, and the former signed off on the revised book without reading it.[75] The fairness opinion was delivered to the Board later that evening.

### G. The Board's Acceptance of the Revised Warburg Offer

The trial court found that, during the final negotiations with Warburg, the Board failed to provide active and direct oversight of RBC. It observed that when the Board approved the merger, the directors were unaware of RBC's last minute efforts to solicit a

---

[71] B321.

[72] B327.

[73] A824.

[74] *Id.*

[75] In an email regarding the revised fairness presentation and letter, Morton stated: "The ravpn network is not letting me in so I cannot see the revised book. If there are no material changes from what we reviewed yesterday, other than the changes that were recommended on the call, then I am fine with it."

buy-side financing role from Warburg, had not received any valuation information until three hours before the meeting to approve the deal, and did not know about RBC's manipulation of its valuation metrics. The record evidence supports the Court of Chancery's findings.

Unbeknownst to the Rural directors, RBC had been communicating with Warburg in the lead up to the private equity firm's revised bid. Carney emailed his private equity firm colleagues the following:

> I have spoken to a number of bankers on our side (for advice) and theirs (for back-channel feedback). There are definitely two other offers as we suspected, both say they need another week of work but the company's bankers think it is more like 2-3 weeks. Sounds like both are higher but again not a knock-out, I haven't been able to get more specific info than that.
>
> The BOD is split. Some are ready to vote yes for us now. Others want to try to get a little more from us, and some a lot more, with silly numbers like $18 being thrown around in the BOD room. The company's bankers think this may just be posturing in front of the bankers, and the bankers have told the BOD that a number like that is not likely to happen ever and certainly not from us.
>
> I think our FL [Joe Landy, Warburg's Co-President] is probably more right than wrong. I think we probably win if we bump at all and $0.25 may be best in terms of helping the BOD drive to a quick consensus. In any event I am convinced we should empty the tank, tell them best and final, and be done. It sounds like the BOD needs to hear that and know there is a binary decision to make on price.[76]

On March 25, Warburg submitted its best and final offer of $17.25 per share. Warburg determined to proceed without utilizing RBC's commitment papers, despite the offer to fund the sponsor's revolver and the bank's other inducements. Munoz and Blair

---

[76] B290; *see also* B609.

Fleming, RBC's Head of U.S. Investment Banking, shared the following email exchange concerning the bank's inability to capture the private equity firm's buy-side financing business:

Munoz: I am the rbc guinea pig. Never easy[.]

Fleming: Yep. Amazing. I have to go see warburg this week. I just pushed 65 revolver through[.]

Munoz: Lets [*sic*] make sure all rbc bankers know they owe us big time. Should be first page of all pitch books.

Fleming: Our revolver in rural is gonna be very very small.[77]

On Sunday, March 27, 2011, the Board met to consider the potential merger. According to the trial court, the Rural directors received written valuation analyses from RBC and Moelis at 9:42 p.m. Eastern time. Because the Board had received no valuation materials until three hours before the meeting to approve the merger, it found that the Rural directors did not have a reasonably adequate understanding of the alternatives available to Rural, including the value of not engaging in a transaction at all. At 9:27 p.m., RBC distributed its fairness opinion deck to Shackelton and DiMino. Moelis distributed its Board materials to Shackelton and DiMino shortly before, at 9:20 p.m. The valuation materials were the first the Board had received since December 2010. At 11 p.m. that evening, without knowledge of RBC's downward modifications to its analysis, back-channel communications with Warburg, and late push to get on the private equity firm's financing tree, the Board and Special Committee held a joint meeting. Shackelton led the meeting before turning it over to RBC, which discussed "the implied

---

[77] B329.

transaction multiples" and the premium that Warburg's offer represented over Rural's current and historical trading prices. Daniel "reviewed RBC's valuation methodologies" with the Board. Shackelton later requested that RBC deliver its financial analysis "and an oral fairness opinion to the Board." RBC opined that the transaction was fair from a financial point of view. The Board approved the merger with Warburg after midnight.

## H. The Rural Proxy Statement

The definitive proxy statement was filed on May 26, 2011 (the "Proxy Statement"). The trial court concluded that the Proxy Statement contained materially misleading disclosures in the form of false information that RBC presented to the Board in its financial presentation. Specifically, the trial court found that information that RBC provided to the Board in connection with its precedent transaction analyses was false, and that false information was repeated in the Proxy Statement.

RBC used the $69.8 million figure in conducting its precedent transaction analysis. The Proxy Statement's pertinent discussion of Adjusted EBITDA, however, refers to a $76.8 million figure and provides that RBC's precedent transaction analysis adjusted for "stock-based compensation, certain one-time expenses, management fees and other expenses . . . ."[78] A stockholder reading the Proxy Statement would likely incorrectly conclude that RBC's precedent transaction range used the disclosed Adjusted EBITDA that added back one-time expenses for 2010. Similarly, a stockholder reading the Proxy Statement would likely incorrectly conclude that the resulting figures were consistent with a Wall Street consensus.

---

[78] A1100.

The trial court also found that the Proxy Statement contained false and misleading information about RBC's incentives and conflicts of interest.[79] The Proxy Statement indicated that the Special Committee was advised of "the potential conflict of interest" regarding RBC, "which had expressed a willingness to offer buy-side financing for any sale transaction that may be pursued . . . ."[80] As to Warburg's potential use of RBC's financing package, the Proxy Statement merely provides: "Although RBC had indicated to potential buyers its willingness to offer buy-side financing and certain of the potential buyers had considered using such financing, the Warburg Pincus bid did not include the financing which it had been offered by RBC."[81] The Proxy Statement omits discussions of RBC's staple financing efforts—in both the Rural and EMS deals—and last minute push to reserve a place on Warburg's financing tree. The disclosure also fails to inform Rural's stockholders that RBC sought to use its Rural engagement to obtain EMS buy-side financing work.

The proxy advisor, Glass, Lewis & Co., LLC ("Glass Lewis"), recommended that Rural's stockholders vote for the merger proposal, reasoning, in part: "[W]e consider that the [B]oard conducted a sufficiently thorough review that would be reasonably expected to generate the greatest possible value for Rural and its shareholders."[82] Further, Glass Lewis suggested that the transaction with the sponsor was advisable because "[t]he [B]oard, with the assistance of independent advisers, conducted a full

---

[79] *See Rural I*, 88 A.3d at 106. We similarly collectively refer to the two disclosure claims discussed above as the "Disclosure Claim."
[80] A1090.
[81] A1092.
[82] B400.

47

auction process prior to executing a deal with Warburg."[83]  For similar reasons, ISS recommended that the Company's stockholders vote for the Warburg deal.  With respect to RBC, ISS acknowledged that the bank was permitted to provide buy-side financing, but, as the trial court observed, incorrectly concluded that RBC had no other conflicts and that the Board sufficiently mitigated potential conflicts of interest.  To that end, elsewhere in its advisory materials, ISS determined that "there are no concerning conflicts of interest."[84]

The Proxy Statement also disclosed that the Special Committee concluded that "RBC's willingness to offer buy-side financing could significantly enhance a potential sale process because such financing could be offered efficiently and could provide a source for financing on terms that might not otherwise be available to potential buyers of the Company . . . ."[85]  This, however, was not true.  The Board never concluded that RBC might provide financing on terms that otherwise might not be available.  When discussing the "major concern" associated with RBC's potential offer of staple financing at the December 23, 2010 meeting of the Special Committee, counsel for the Special Committee noted that such an offer "could provide a floor for financing that would be available to potential purchasers of the Company."[86]

---

[83] B399.
[84] B407.
[85] A1090.
[86] A407.

On June 30, 2011, the transaction was announced. The Agreement and Plan of Merger, dated as of March 28, 2011, provided the Board with a fiduciary out that enabled it to consider higher bids. No other bidders emerged.

### I. RBC's Public Statements and Pleadings Concerning Staple Financing

Jervis raises a number of points regarding RBC's litigation conduct. These points later formed the basis, in part, for Jervis's fee shifting motion. On February 12, 2015, the Court of Chancery held a hearing and ultimately concluded that RBC "approached the pretrial briefing and trial as if the issue wasn't what actually happened and what was true as to the facts within their control but, rather, whether the plaintiff had generated discovery that could prove something different."[87] The trial court suggested that RBC's bad faith litigation conduct touched upon its failure to appropriately characterize its staple financing efforts; the interactive dynamic between its financing and M & A teams; and, perhaps most problematically, the nature of its pursuit of Warburg's buy-side financing business. Despite the fact that these misstatements struck at central issues before the Court of Chancery for adjudication, the trial court concluded that fee shifting was not warranted because RBC's misstatements did not cross the threshold of "glaring egregiousness."[88] In addition to noting that RBC's trial conduct was "aggressive" and "problematic,"[89] the Court of Chancery remarked: "Here, I think there's [*sic*] glimmers of egregiousness. I think there's some egregiousness."[90]

---

[87] Ans. Br. Ex. A. Tr. 68:5-10 (Feb. 12, 2015).
[88] *Id.* at 72:22.
[89] *Id.* at 72:20-21.
[90] *Id.* at 68:1-2.

This ruling forms the basis of Jervis's cross-appeal, which we also address below.

### III.   ANALYSIS

### *A. Revlon*

### 1.  Contentions of the Parties

RBC argues that the trial court erred by holding that the Board breached its duty of care under the enhanced scrutiny articulated in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[91]   While RBC agrees that *Revlon* applies, it argues that the trial court incorrectly applied *Revlon*'s enhanced scrutiny to the December 2010 time-frame, when it contends that the Company was merely exploring strategic alternatives; that the Board's actions do not fail *Revlon* scrutiny in view of the public auction, modest deal protections, and the 90-day post-signing market check; and that the trial court erred by finding a due care violation without finding gross negligence.

Jervis argues that RBC's *Revlon* arguments are meritless.  Neither party argued in the trial court that *Revlon*'s enhanced scrutiny applied.  In fact, *Revlon* was not addressed in any pre- or post-trial briefing.  In the Court of Chancery, Jervis asserted that the entire fairness standard applied.  Jervis contends that this Court can affirm on an alternative basis and uphold the ruling that the Board breached its fiduciary duties because the transaction was not entirely fair.

---

[91] 506 A.2d 173 (Del. 1986).

## 2. Standard of Review

Our review of a trial court's application of enhanced scrutiny to board action necessarily implicates a review of law and fact.[92] The deferential "clearly erroneous" standard applies to findings of historical fact.[93] "That deferential standard applies not only to historical facts that are based upon credibility determinations[,] but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[94] The Court of Chancery's legal conclusions are reviewed *de novo*.[95] This Court may affirm on the basis of a different rationale than that which was articulated by the trial court, if the issue was fairly presented to the trial court.[96]

## 3. Discussion

In *Malpiede v. Townson*, this Court explained that enhanced scrutiny under *Revlon* does not change the nature of the fiduciary duties owed by directors:

> *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise. Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not

---

[92] *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1385 (Del. 1995) (applying *de novo* review to the Court of Chancery's legal conclusions and clear error review to its factual findings).

[93] *See DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago, Ill.*, 75 A.3d 101, 108-09 (Del. 2013).

[94] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

[95] *Unitrin*, 651 A.2d at 1385.

[96] *Id.* at 1390 (citing *Standard Distrib. Co. v. Nally*, 630 A.2d 640, 647 (Del. 1993)).

eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale.[97]

"In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end."[98] *Revlon* "requires us to examine whether a board's overall course of action was reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable."[99] As we recently reiterated in *C & J Energy*, "there is no single blueprint that a board must follow to fulfill its duties, and a court applying *Revlon*'s enhanced scrutiny must decide whether the directors made a *reasonable* decision, not a *perfect* decision."[100]

On appeal, both parties agree that *Revlon* applies—only they differ as to when, in the continuum between December 2010 and March 2011, *Revlon*'s enhanced scrutiny was triggered. At oral argument, counsel for RBC contended that *Revlon* applied "at the point where the auction was coming to an end and they had two bids, and they were then in a position of deciding to sell the Company -- when the sale of the Company became inevitable . . . . That's when it became inevitable in this fact pattern."

As to RBC's argument that the business judgment rule—not *Revlon*—applies to the Board's decision to explore strategic alternatives in December 2010, the most faithful reading of the record before us is that the Court of Chancery, as a factual matter, found

---

[97] *Malpiede v. Townson*, 780 A.2d 1075, 1083-84 (Del. 2001) (citations omitted).
[98] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1993).
[99] *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust*, 107 A.3d 1049, 1066 (Del. 2014) (citing *QVC*, 637 A.2d at 41; *Unitrin*, 651 A.2d at 1385-86).
[100] *Id.* at 1067 (citations omitted) (internal quotations omitted).

that there was no exploration of strategic alternatives. Instead, the trial court found that the Special Committee, acting "without Board authorization," "hired RBC to sell the Company." On this point, the trial court concluded that, "[b]ased on the totality of the evidence, the initiation of a sale process in December 2010 fell outside the range of reasonableness[,]" that "Shackelton and RBC got too far out in front of the Board, and [that] RBC's advice was overly biased by its financial interests."[101]

RBC does not challenge the predicate factual findings upon which the trial court's *Revlon* holding rests.[102] There is sufficient evidence in the record to support the trial court's conclusions. For example, on December 23, DiMino emailed the head of RBC's Rural team, Munoz, the following: "Well done, lets [*sic*] get this baby sold!"[103] Earlier that day, Munoz notified his RBC colleagues: "Just got word we got the Rural Metro sellside [*sic*] mandate."[104] RBC, thus, understood that it was engaged to sell the Company. Munoz told other lead RBC bankers that the engagement "is the deal thats [*sic*] going to put our Healthcare services sellside [*sic*] effort on the map. Big name sponsors are going to look at this asset."[105]

Other evidence suggests that RBC understood that it had been charged to sell Rural. For example, an internal RBC memorandum documented that Rural engaged the

---

[101] *Rural I*, 88 A.3d at 93.
[102] RBC contends that "[*u*]*nder the facts as found*, *Revlon* scrutiny could not possibly apply to the Board's actions during December 2010 . . . ." Op. Br. 17 (emphasis added). It urges that this Court "need not review any factual findings to determine that the trial court erred by applying enhanced scrutiny to the Board's decision to explore alternatives because this Court has twice held that being in play does not trigger *Revlon*." *Id.* at 18.
[103] B106.
[104] B108.
[105] B107.

bank "as sell-side advisors to explore the sale of the Co[mpany]."[106]  The memorandum continued, suggesting that the Rural "transaction represents an important Healthcare sell-side mandate for the bank in addition to being a large fee event."[107]

While the focus of the Special Committee and RBC in December 2010 was on commencing a sale process, there is other evidence that, at least facially, suggests the Special Committee had not completely abandoned the other alternatives.[108]  But "[w]here the support in the record is sufficient for a factual finding, even if there can be a reasonable difference of view, our standard of review compels us to defer to the trial court.  Our function here is not to substitute our judgment for the trial court's as though we had before us an original application."[109]  Thus, we will not disturb the Court of Chancery's factual determination that, in December 2010, "the directors had never

---

[106] B139.

[107] B140.

[108] For example, Rural's Engagement Letter with RBC and Moelis stated that the two financial advisors, together, were engaged to "provide certain investment banking and financial advisory services in connection with the exploration by the Company of various strategic alternatives including a possible Sale Transaction . . ., AMR Acquisition Transaction . . . or Alternative AMR Acquisition Transaction . . . ." A551 (alterations removed).  Further, on December 26, 2010, Shackelton emailed the Board with an update on the Rural process, suggesting that the Special Committee and its advisors were "continuing to refine a target list of [private equity] firms (10-15)" for the "[p]artner/sale" process.  B118.  The email continued:  "[W]e are considering the benefits of more formally reaching out to 6-12 other [private equity firms] in order to gauge their level of interest in Rural (either as a partner in an AMR acquisition or [as] an acquisition target)."  B118.  Three days later, after holding a call with Shackelton to discuss the Rural process, Tim Balombin, a member of RBC's M & A team, communicated to Daniel the following:  "High level takeaway is that [Shackelton] supports a two track process and selling the [C]ompany (even to the non-EMS winner), but also wants to ensure we preserve [the] ability to buy AMR should the situation arise."  A544.

[109] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 381-82 (Del. 2014) (citations omitted).  *See Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987) (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972) ("We do not, however, ignore the findings made by the trial judge.  If they are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions.")).

actually authorized a sale process[,]" and that "[i]t was Shackelton and RBC who expanded their mandate into a sale."[110]

As a legal matter, RBC's counsel argued that *Revlon* could not apply in December 2010, since, at that point, the sale of the Company was not "inevitable." Rather, RBC contends that *Revlon* does not apply until the end of the process in late March 2011, since Shackelton could not have sold Rural absent Board approval.

We have recognized at least three scenarios in which enhanced scrutiny under *Revlon* is triggered, including:

> (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company[;] (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company[;] or (3) when approval of a transaction results in a sale or change of control[.] In the latter situation, there is no sale or change in control when "[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market."[111]

Further, in *Revlon*, we stated that "[t]he Revlon board's authorization permitting management to negotiate a merger or buyout with a third party was a recognition that the company was for sale. The duty of the board had thus changed from the preservation of

---

[110] *Rural I*, 88 A.3d at 73. The NACD argues that, "[i]f the Court of Chancery is correct that the decision to initiate a sale process is subject to *Revlon* scrutiny, rather than the actions that follow from a sale decision, that constitutes a tectonic shift in the fiduciary landscape for directors." NACD Br. 6. They argue further that "directors must be able to consider freely the exploration of strategic alternatives (including a sale), without such discussions triggering *Revlon*'s duty to maximize short-term value." NACD Br. 7. We agree, and our narrow ruling premised on these unusual facts effects no shifts in the *Revlon* landscape, let alone tectonic ones. The point the NACD misses is that the trial court, as a factual matter, found that there was no exploration of alternatives in December 2010, and that Shackelton and RBC had initiated an active sale process without Board authorization.

[111] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (internal quotations omitted) (internal citations omitted) [hereinafter, "*Arnold I*, 650 A.2d at __"].

Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit."[112]   In *Lyondell Chemical Co. v. Ryan*, we held that enhanced scrutiny did not arise "simply because [the] company [was] in play[,]"[113] but rather as a consequence of the fact that the "directors began negotiating the sale of [the company]."[114]

Here, we are presented with the unusual situation where Shackelton and RBC— and ostensibly the Special Committee—initiated a sale process in December 2010 that, at the time, was not authorized by the Board, but which events were later purportedly ratified by the Board on March 15, 2011.  RBC argues that "the trial court repeated the error that *Lyondell* reversed," and that being "in play" is not enough:  the Board must embark on a change of control transaction, and that the focus should be at the end of the process, because, they say, "[a]fter all, at the end of an auction, a board may decide to refuse all offers."[115]

We reaffirm our holding in *Lyondell*, and reject RBC's attempt to delay the triggering of *Revlon* to late March 2011 for three reasons.  First, without genuinely exploring other strategic alternatives, the Special Committee initiated an active bidding process seeking to sell itself in December 2010, and the Board, on March 15, 2011, purportedly "restated and ratified" the actions of the Special Committee, including the initiation of the sale process that had transpired over the preceding months.  The March

---

[112] *Revlon*, 506 A.2d at 182.
[113] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009) (quoting *Paramount Commc'ns v. Time Inc.*, 571 A.2d 1140, 1151 (Del. 1989)).
[114] *Id.*
[115] Op. Br. 20 (citation omitted).

15, 2011 minutes state, in a section entitled "*Scope of authority – Special Committee*," that the Company's legal counsel reviewed with the Board "the resolutions adopted by it to date in reference to the authority and activities of the Special Committee, and further discussed updates to such resolutions that were *desirable in view of the evolution of the sale evaluation process . . . .*" The Board resolution then "ratifies and restates" the Board's delegation to the Special Committee of the "*exclusive power and authority*" to, among other things, "solicit proposals for a Potential Transaction," "negotiate and finalize terms of any such Potential Transaction," and "report its findings and recommendations to the full Board . . . ."[116] The March 15 minutes state that the Board was briefed on the Special Committee's activities, and a logical inference is that its resolution reflects the Board's recognition of, and attempt to fix, the problem posed by the Special Committee having exceeded its authority. Thus, the March 15 "restatement and ratification," which deemed the actions of the Special Committee to be acts of the Company, undermines RBC's contention that *Revlon* should not apply because action by the *full Board* was required.[117]

---

[116] A620. Notably, the prior grants of authority as reflected in the October 27 and December 8 minutes do not mention any grant of "exclusive" authority to the Special Committee. The October 27, 2010 minutes refer to the "authority" of the Special Committee, not its "exclusive authority." A274. The December 8, 2010 minutes revised the scope of authority of the Special Committee, but omit any reference to the Committee's "exclusive power and authority." *See* A394.

[117] A number of factors influence the amount and type of interaction between the board and a special committee to which the board has delegated certain authority during the course of a sale process. We adhere to our observations in *C & J Energy* that "perfection" is not the standard. And while there is no blueprint for the degree and type of interaction required, the Board's passivity and lack of effective oversight of the sale process was unreasonable. *Compare C & J Energy Servs.*, 107 A.3d at 1060, 1066 (noting that while the C & J board process "sometimes fell short of ideal," the CEO/Chairman "continually shared the details of the valuation changes

Second, while RBC relies on *Lyondell* for the proposition that merely being "in play" does not trigger *Revlon*, that case involved a third party putting the target company in play. The third party's Schedule 13D signaled to the market that Lyondell was "in play," but the directors decided that they would neither put the company up for sale nor institute defensive measures to fend off a possible hostile offer. Instead, the directors decided to take a "wait and see" approach. We held that, "[t]he time for action under *Revlon* did not begin until . . . the directors began negotiating the sale of Lyondell."[118] Further, we stated that "[t]he duty to seek the best available price applies only when a company embarks on a transaction—on its own initiative or in response to an unsolicited offer—that will result in a change of control."[119] Here, with assistance from RBC, Shackelton, who was then Chairman of both the Special Committee and the Board, initiated the sale process in December 2010. Given that the Board deemed "any and all actions heretofore taken by . . . the Special Committee . . . acts and deeds of the

and negotiations with the C & J board, which was majority-independent, and which had the final say in approving the deal before it went to a stockholder vote[,]" and that, "[a]lthough the board authorized [the CEO/Chairman] to lead the negotiations" on its behalf, "C & J's board remained engaged in the process") (citations omitted) *with Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) ("Although the Macmillan board was fully aware of its ultimate responsibility for ensuring the integrity of the auction, the directors wholly delegated the creation and administration of the auction to an array of [the chairman and CEO's] hand-picked investment advisors."). In *Mills*, we stated that while a board is entitled to rely upon experts, officers, and employees selected with reasonable care under 8 *Del. C.* 141(e), "it may not avoid its active and direct duty of oversight in a matter as significant as the sale of corporate control." *Id.*

[118] *Lyondell*, 970 A.2d at 242.

[119] *Id.* (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995)).

Company[,]"[120] we confine our holding to these unusual facts and do not view our affirmance of the trial court's holding as a departure from our prior case law.[121]

Third, to sanction RBC's contention would allow the Board to benefit from a more deferential standard of review during the time when, due to its lack of oversight, the Special Committee and RBC engaged in a flawed and conflict-ridden sale process. Given the parties' agreement on appeal that *Revlon* applies, the acceptance by both parties of the predicate "facts as found," RBC's acknowledgement that, as we stated in *C & J Energy*, "*Revlon* requires us to examine whether a board's overall course of action was reasonable,"[122] we decline to upset the trial court's legal determination as to when *Revlon* was triggered.

We agree with the Court of Chancery's principal conclusion that the Board's overall course of conduct fails *Revlon* scrutiny. *Revlon* permits a board to pursue the transaction it reasonably views as most valuable to the stockholders, provided "the

---

[120] A621.

[121] To sanction an argument that *Revlon* applies only at the very endpoint of the sale process— and not during the course of the overall sale process—would afford the Board the benefit of a more lenient standard of review where the sale process went awry, partially due to the Board's lack of oversight. Such a result would potentially incentivize a board to avoid active engagement until the very end of a sale process by delegating the process to a subset of directors, officers, and/or advisors.

[122] *C & J Energy Servs.*, 107 A.3d at 1066. Counsel for RBC argued that *Revlon* applies when the "Board gets to the point where it now has all the information it needs for a sale and is comparing that to remaining independent or some other alternative that it might have. That's the point at which the *Revlon* duties attach. And it is certainly at that point -- it's not as if the court ignores what's gone before that -- because you certainly -- there's sort of a sliding scale and you look at what kind of activity there was, in terms of price discovery, before that point and after that point. And that's the part that we think the trial court, here, missed. It's the afterward part that they need to look at, as well." Videotape: Oral Argument Before the Delaware Supreme Court, at 4:50 (*RBC Capital Markets, LLC v. Joanna Jervis*, No. 140, 2015, September 30, 2015), *archived at* http://livestream.com/DelawareSupremeCourt/events/4384267/videos/100717775.

transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so."[123]  We stated in *C & J Energy* that "[s]uch a market check does not have to involve an active solicitation, so long as interested bidders have a fair opportunity to present a higher-value alternative, and the board has the flexibility to eschew the original transaction and accept the higher-value deal."[124]

Here, the evidence fully supports the trial court's findings that the solicitation process was structured and timed in a manner that impeded interested bidders from presenting potentially higher value alternatives.  This aspect of the trial court's ruling relied, in part, upon findings that RBC designed the sale process to run in parallel with a process being conducted by EMS, and that "RBC did not disclose that proceeding in parallel with the EMS process served RBC's interest in gaining a role on the financing trees of bidders for EMS."[125]  We agree with the trial court's suggestion that the reasonableness of initiating a sale process to run in tandem with the EMS auction, absent conflicts of interest, "would be one of the many debatable choices that fiduciaries and

---

[123] *C & J Energy Servs.*, 107 A.3d at 1067 (citing *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997); *Freedman v. Rest. Assocs. Indus. Inc.*, 1990 WL 135923 (Del. Ch. Sept. 19, 1990); *Roberts v. Gen. Instrument Corp.*, 1990 WL 118356 (Del. Ch. Aug. 13, 1990); *In re RJR Nabisco, Inc. S'holders Litig.*, 14 Del. J. Corp. L. 1132 (Del. Ch. 1989); *In Re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del. Ch. Aug. 8, 1988)).

[124] *Id.* at 1067-68 (citing *Lyondell*, 970 A.2d at 243; *In re Dollar Thrifty S'holders Litig.*, 14 A.3d 573, 612-13, 615 (Del. Ch. 2010); *In re MONY Grp. Inc. S'holders Litig.*, 852 A.2d 9 (Del. Ch. 2004); *Equity-Linked Investors*, 705 A.2d at 1056-58; *Herd v. Major Realty Corp.*, 1990 WL 212307, at *9 (Del. Ch. Dec. 21, 1990); *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 278, 289 (Del. Ch. 1989)).

[125] *Rural I*, 88 A.3d at 91.

their advisors must make . . . and it would fall within the range of reasonableness."[126] But where undisclosed conflicts of interest exist, such decisions must be viewed more skeptically.

The record indicates that Rural's Board was unaware of the implications of the dual-track structure of the bidding process and that the design was driven by RBC's motivation to obtain financing fees in another transaction with Rural's competitor. There is ample evidence that there were material barriers, including confidentiality restrictions, that would have impeded or prevented a bidder from making an offer. For example, the record supports the trial court's findings that a bidder for EMS would need a separate team of advisors to participate in the Rural process, and that these individuals could not share confidential information with advisors working on a potential EMS acquisition. RBC also did not explain that a successful bidder for EMS would own a Rural competitor, making it difficult for the Company to provide due diligence freely to such bidder. The trial court found that "[t]here is no contemporaneous evidence that [these problems] were identified and considered."[127] These findings are sufficiently supported by the record evidence.

The Board, as a result, took no steps to address or mitigate RBC's conflicts. Directors frequently rely on expert opinions concerning the fairness of proposed transactions, and the Delaware General Corporation Law recognizes that directors may

---

[126] *Id.*

[127] *Id.* at 92.

rely upon such expert opinions. In *Citron v. Fairchild Camera & Instrument Corp.*, this Court observed:

> [W]e are, of course, ever mindful of the realities of corporate directorship. We recognize that management is often the catalyst in the decision-making process. We further recognize that a board will receive substantial information from third-party sources. As we have noted on various occasions, however, in change of control situations, sole reliance on hired experts and management can "taint[] the design and execution of the transaction." Thus, we look particularly for evidence of a board's active and direct role in the sale process.[128]

While a board may be free to consent to certain conflicts, and has the protections of 8 *Del. C.* § 141(e), directors need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest.[129] But, at the same time, a board is not required to perform searching and ongoing due diligence on its retained advisors in order to ensure that the advisors are not acting in contravention of the company's interests, thereby undermining the very process for which they have been retained. A board's consent to a conflict does not give the advisor a "free pass" to act in its own self-interest and to the detriment of its client. Because the conflicted advisor may, alone, possess information relating to a conflict, the

---

[128] *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989) (quoting *Mills*, 559 A.2d at 1281) (internal citation omitted).

[129] "Under 8 *Del. C.* § 141(e), when corporate directors rely in good faith upon opinions or reports of officers and other experts 'selected with reasonable care,' they necessarily do so on the presumption that the information provided is both accurate and complete. Normally, decisions of a board based upon such data will not be disturbed when made in the proper exercise of business judgment." *Mills*, 559 A.2d at 1283-84. A board's reasonable reliance on an advisor presupposes that it has undertaken to manage conflicts as part of its oversight of the process. A board's consent to the conflicts of its financial advisor necessitates that the directors be especially diligent in overseeing the conflicted advisor's role in the sale process.

board should require disclosure of, on an ongoing basis, material information that might impact the board's process.[130]

In addition to the problems with the design of the sale process, the trial court found that Rural's directors were not adequately informed as to Rural's value. Further, the trial court concluded that, when the Special Committee and RBC were selling Rural, "the Company's value on a stand-alone basis exceeded what a private equity bidder willingly would pay."[131] RBC contends that the trial court ignores our recent holding in *C & J Energy*, advocating that the post-signing market check cures any shortcomings of the Rural sale process. The NACD argues that, "this Court has recognized that the absence of topping bids from the market evidences that a board had adequate information to evaluate a sale."[132]

But RBC ignores other significant aspects of our holding in *C & J Energy*, including our recognition that "[t]he ability of the stockholders themselves to freely accept or reject the board's preferred course of action is also of great importance in this context."[133] Here, the stockholders—and the Board—were unaware of RBC's conflicts and how they potentially impacted the Warburg offer. Unlike the C & J Energy directors, the Board failed to appropriately satisfy itself that the Warburg transaction was the best

---

[130] For instance, the board could, when faced with a conflicted advisor, as a contractual matter, treat the conflicted advisor at arm's-length, and insist on protections to ensure that conflicts that might impact the board's process are disclosed at the outset and throughout the sale process.

[131] *Rural I*, 88 A.3d at 103.

[132] NACD Br. 15 (citing *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989)).

[133] *C & J Energy Servs.*, 107 A.3d at 1068 (citing *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 449 (Del. Ch. 2012); *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 515 (Del. Ch. 2010); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 208 (Del. Ch. 2007); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1023 (Del. Ch. 2005)).

course of action for its stockholders. Moreover, Rural's directors were not in a position to rely on the ability of the Company's stockholders to have a fair chance to evaluate its decision, in light of the fact that both the Board and the stockholders were operating on the basis of an informational vacuum created by RBC.[134] Rural's directors were not "well-informed" as to Rural's value, such that the decision to accept Warburg's offer was devoid of "important efforts" by the Company's directors "to protect their stockholders and to ensure that the transaction was favorable to them."[135]

The Court of Chancery determined that, "[a]s a result of th[e] faulty process, the merger did not generate for stockholders the best value reasonably attainable. . . . RBC's faulty design prevented the emergence of the type of competitive dynamic among multiple bidders that is necessary for reliable price discovery."[136] We agree.

"When a board exercises its judgment in good faith, tests the transaction through a viable passive market check, and gives its stockholders a fully informed, uncoerced opportunity to vote to accept the deal," a court will have difficulty determining that such board violated its *Revlon* duties.[137] But here, the Company's stockholders were not fully informed when they voted to accept the deal. A confluence of factors undercut the

---

[134] *See, e.g., id.* at 1070 ("Although the C & J board had to satisfy itself that the transaction was the best course of action for stockholders, the board could also take into account that its stockholders would have a fair chance to evaluate the board's decision for themselves.").

[135] *Id.* at 1069.

[136] *Rural I*, 88 A.3d at 102-03; *see also Netsmart*, 924 A.2d at 184 (discussing an unreasonably-conducted, target-initiated active bidding process involving an "informal and haphazard market canvass" that excluded potential strategic buyers).

[137] *C & J Energy Servs.*, 107 A.3d at 1053.

reliability and competitiveness of the Rural sale process.[138] Moreover, the presence of Moelis failed to cleanse the defects in the process and the defective financial advice the Board received from RBC. The Board treated its advice as secondary to that of RBC and, like RBC, Moelis's compensation was mostly contingent upon consummation of a transaction.

Finally, we reject RBC's contention that the trial court erred by finding a due care violation without finding gross negligence. RBC argues that intermediate scrutiny under *Revlon* exists to determine whether plaintiff stockholders should receive pre-closing injunctive relief, but it cannot be used to establish a breach of fiduciary duty that warrants post-closing damages.

When disinterested directors themselves face liability, the law, for policy reasons, requires that they be deemed to have acted with gross negligence in order to sustain a monetary judgment against them. That does not mean, however, that if they were subject to *Revlon* duties, and their conduct was unreasonable, that there was not a breach of fiduciary duty.[139] The Board violated its situational duty by failing to take reasonable steps to attain the best value reasonably available to the stockholders. We agree with the

---

[138] Those factors included: (i) "the Company was just beginning to implement new growth strategies under a new CEO[;]" (ii) for various reasons, "the market did not understand Rural's prospects[;]" (iii) large private equity buyers were tied up in the EMS process; and (iv) logical strategic bidders were focused on their own change of control transactions. *Rural I*, 88 A.3d at 101-03.

[139] *See Corwin v. KKR Fin. Holdings LLC*, 2015 WL 5772262, at *6 (Del. Oct. 2, 2015) ("*Unocal* and *Revlon* are primarily designed to give stockholders and the Court of Chancery the tool of injunctive relief to address important M & A decisions in real time, before closing. They were not tools designed with post-closing money damages claims in mind, the standards they articulate do not match the gross negligence standard for director due care liability under *Van Gorkom* . . . ."). At trial, Jervis was not seeking to impose liability on the defendant directors, since Jervis had settled the litigation as to them.

65

trial court that the individual defendants breached their fiduciary duties by engaging in conduct that fell outside the range of reasonableness, and that this was a sufficient predicate for its finding of aiding and abetting liability against RBC.

### B. The Board Violated its Disclosure Obligations

#### 1. Contentions of the Parties

The Court of Chancery concluded that RBC aided and abetted the Board's breach of the fiduciary duty of disclosure, due to the fact that the "Proxy Statement contained false and misleading information about RBC's incentives," in addition to "false information that RBC presented to the Board in its financial presentation." RBC argues that the trial court erred in finding that the Proxy Statement was misleading, and in its finding that the purported misstatements and omissions were material.

#### 2. Standard of Review

Whether disclosures are adequate "is a mixed [question] of law and fact, requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholder."[140] Thus, "this Court has the authority to review the entire record and to make its own findings of fact in a proper case."[141] But "if the findings of the trial judge 'are sufficiently supported by the record and are the product of an orderly and logical deductive process, . . . we accept them, even though independently we might have reached opposite conclusions.'"[142]

---

[140] *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992) (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944-45 (Del. 1985)) (citations omitted).
[141] *Id.* (quoting *Levitt*, 287 A.2d at 673) (internal quotation omitted).
[142] *Id.*

### 3. Discussion

RBC lodges three challenges to the trial court's analysis with respect to the Disclosure Claim. First, as to the valuation analysis, RBC argues that the Board did not falsely summarize RBC's fairness analysis in the Proxy Statement. Further, RBC claims that the trial court incorrectly scrutinized whether the analysis performed was proper, as opposed to whether such analysis was accurately described in the Proxy Statement. Second, RBC contends that the Board and the Company's stockholders were aware of RBC's role in the EMS financing as a result of a February 14, 2011 CD & R press release identifying RBC among the banks providing the private equity firm with financing in the EMS transaction.[143] RBC also asserts that it negotiated a term in the Engagement Letter that permitted it to participate in financing the purchase of Rural's competitors. On this point, RBC argues that the Proxy Statement described its relationship with Warburg and disclosed that it was given permission "to indicate that it would be willing to offer buy-side financing."[144] Such disclosure, according to RBC, was sufficient to inform stockholders that RBC operated with a potential conflict throughout the sale process. Finally, RBC contends that the trial court's finding that the Proxy Statement contained materially misleading disclosures about the Board's conclusion as to RBC's ability to provide financing to potential purchasers was incorrect.

---

[143] The CD & R press release, dated February 14, 2011, noted that "CD&R has obtained committed financing from Barclays Capital, Deutsche Bank Securities Inc., BofA Merrill Lynch, affiliates of Morgan Stanley, RBC Capital Markets and UBS Investment Bank." A589. The press release also stated that "Barclays Capital, Deutsche Bank Securities Inc., Morgan Stanley & Co., RBC Capital Markets and UBS Investment Bank acted as financial advisors" to CD & R in the EMS transaction. A590.

[144] A1091.

The Board's "fiduciary duty of disclosure, like the board's duties under *Revlon* and its progeny, is not an independent dut[y] but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty."[145] In *Pfeffer v. Redstone*, we stated that "[c]orporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[146] We also observed that, "[t]o state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials."[147]

For an omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[148] Stated another way, "[o]mitted facts are material 'if there is a substantial likelihood that a reasonable stockholder would consider [them] important in deciding how to vote.'"[149] Materiality "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote[,]"[150] only that

---

[145] *Malpiede*, 780 A.2d at 1086 (citations omitted).

[146] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (citations omitted) (internal quotation omitted).

[147] *Id.* at 686 (citations omitted) (internal quotation omitted).

[148] *Arnold I*, 650 A.2d at 1277 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (emphasis removed) (citations omitted). *See Rosenblatt*, 493 A.2d at 944; *Zirn v. VLI Corp.*, 621 A.2d 773, 778-79 (Del. 1993).

[149] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000) (quoting *Louden v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997)).

[150] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus.*, 426 U.S. at 449).

such reasonably available information would have impacted upon a stockholder's voting decision. But "[o]mitted facts are not material simply because they might be helpful."[151]

### i. The Valuation Analysis

The Court of Chancery's finding that the Proxy Statement incorporated a false valuation analysis centered on the fact that "RBC told the [Board] that it used 'Wall Street research analyst consensus projections' to derive Rural's EBITDA for 2010."[152] According to the trial court, "[t]he 'consensus projections' were neither analyst projections, nor did they represent a Wall Street consensus. The figures were actually Rural's reported results, not projections, and RBC used the reported figures without adjusting for one-time expenses, which was contrary to the Wall Street consensus."[153]

RBC rests its argument on three points. It contends that the trial court (1) erred in analyzing whether RBC's fairness analysis was flawed rather than whether the Proxy Statement fairly and accurately described that analysis; (2) erred in concluding that the underlying fairness analysis was false; and (3) erred in determining that the Adjusted EBITDA figure used in conducting the precedent transaction analysis was material. We disagree with these contentions.

The trial court concluded that the Proxy Statement did not accurately represent RBC's analysis. It found that RBC employed an Adjusted EBITDA figure of $69.8 million when conducting its precedent transaction analysis, while the Proxy Statement's disclosures with respect to Rural's 2010 Adjusted EBITDA referenced the $76.8 million

---

[151] *Skeen*, 750 A.2d at 1174.
[152] *Rural I*, 88 A.3d at 104.
[153] *Id.*

69

figure. Moreover, the Proxy Statement stated that RBC adjusted the guideline target companies' EBITDA in its precedent transaction analysis "to account for . . . certain one-time expenses . . . ."[154] The trial court also found that the Proxy Statement falsely suggested that RBC performed its analysis in accordance with Wall Street analyst "consensus." Accordingly, the trial court determined that a stockholder reviewing the Proxy Statement would incorrectly conclude that RBC used the disclosed Adjusted EBITDA that added back one-time expenses.

Here, the trial court's decision was both supported by the record and well-reasoned. There is a substantial likelihood that a reasonable stockholder would consider the Adjusted EBITDA figure used in conducting the precedent transaction analysis to be material when considering how to vote. Both ISS and Glass Lewis interpreted $8.19 per share—the low end of the "consensus" range at 6.3x—as the true low end of RBC's precedent transaction analysis. We agree with the trial court's conclusion that the "consensus" range was artificial and misleading, and that the information that RBC provided for the Proxy Statement about its precedent transaction analysis was material and false.

### ii. RBC's Failure to Fully Disclose its Conflicts

RBC contends that its last minute efforts seeking to provide staple financing to Warburg were "not material." RBC further urges that stockholders reading the Proxy Statement knew that RBC operated with a potential conflict and that disclosure of that

---

[154] A1100.

potential conflict was sufficient.[155]  The Court of Chancery concluded that the "Proxy Statement contained false and misleading information about RBC's incentives."[156]  In so doing, it reiterated that "it is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. . . ."[157]  We agree.

The Proxy Statement stated that RBC received the right to offer staple financing because it "could provide a source for financing on terms that might not otherwise be available to potential buyers of the Company . . . ."[158]  The trial court determined that this statement was "false," given that the Board "never concluded that RBC could provide financing that might otherwise not be available, and no evidence to that effect was introduced at trial."[159]  This finding is supported by the record.

The Proxy Statement's discussion of RBC's right to offer staple financing was a partial disclosure.  When parties to a transaction and their advisors "travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders

---

[155] Similarly, the NACD contends that, "[i]t should be enough to disclose RBC had *permission* to seek to offer buy-side financing, as Rural did here."  NACD Br. 17 (emphasis added).  We disagree.

[156] *Rural I*, 88 A.3d at 105.

[157] *Id.* (quoting *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008)).  *See also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) (requiring disclosure of a CEO conflict of interest, where the CEO acted as negotiator and observing that, "a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price").

[158] A1090.

[159] *Rural I*, 88 A.3d at 106.

71

with an accurate, full, and fair characterization of those historic events."[160]  The Proxy Statement failed to disclose how RBC used the Rural sale process to seek a financing role in the EMS transaction.  Nor did it disclose RBC's courtship of Warburg.  When viewed in conjunction with the potential fees RBC was to receive for its financing services, the investment bank's pursuit of Warburg's financing business was demonstrative of a conflict that was unquestionably material, and necessitated full and fair disclosure for the benefit of the stockholders.

### C. RBC Aided and Abetted the Board's Breaches

#### 1.  Contentions of the Parties

RBC advances three arguments to support its claim that the Court of Chancery erred in determining that the investment bank aided and abetted the Board's breach of the duty of care.  First, RBC argues that a third party cannot "knowingly participate" in an exculpated breach of the duty of care, and it contends that a third party cannot knowingly participate in a breach of the duty of care that is not "inherently wrongful."  Second, RBC suggests that the Court of Chancery erred by concluding that "a third party" can be deemed to have knowingly participated in a breach of the duty of care when it "misleads directors into breaching their" fiduciary obligation.  Finally, RBC asserts that aiding and abetting is a "subset of conspiracy" and therefore rests on proof that the aider and abettor agreed to a joint course of conduct with the primary actor.

#### 2.  Standard of Review

---

[160] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (quoting *Arnold I*, 650 A.2d at 1280) (citation omitted) [hereinafter, "*Zirn II*, 681 A.2d at __"].

This Court reviews the Court of Chancery's conclusions of law *de novo*.[161] However, we afford a trial court's factual findings a "high level" of deference,[162] and we will not disturb such conclusions unless they are the by-product of clear error.[163]

### 3. Discussion

In *Malpiede v. Townson*, this Court described the elements of aiding and abetting breaches of fiduciary duty as: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.[164] The first two elements are established as set forth above.

As to the third element, this Court, in *Malpiede*, observed that "[a] third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach."[165] We stated further that "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a

---

[161] *Unitrin*, 651 A.2d at 1385.

[162] *United Techs.*, 109 A.3d at 557 (quoting *DV Realty Advisors*, 75 A.3d at 108).

[163] *DV Realty Advisors*, 75 A.3d at 109.

[164] *Malpiede,* 780 A.2d at 1096 (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)). *See also Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984). In *Malpiede*, we "express[ed] no view on the question whether a third party may 'knowingly participate' in or give substantial assistance to a board's grossly negligent conduct or whether a third party may be liable for aiding and abetting only if the board's breach is intentional." *Malpiede*, 780 A.2d at 1097 n.78 (citations omitted).

[165] *Malpiede*, 780 A.2d at 1096 (quoting *Gilbert*, 490 A.2d at 1057) (citations omitted). *See also Mills*, 559 A.2d at 1284 n.33 (noting that "it is bedrock law that the conduct of one who knowingly joins with a fiduciary, including corporate officials, in a breach of a fiduciary obligation, is equally culpable").

breach."[166] As an example, this Court has said that "a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board."[167] The trial court, in a lengthy analysis of aiding and abetting law and tort law, held that if a "[i]f the third party knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[168] We affirm this narrow holding.

It is the aider and abettor that must act with *scienter*. The aider and abettor must act "knowingly, intentionally, or with reckless indifference . . .[;]"[169] that is, with an "illicit state of mind."[170] To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had "actual or constructive knowledge that their conduct was legally

---

[166] *Malpiede,* 780 A.2d at 1097 (citations omitted).

[167] *Id.* (citing *Gilbert*, 490 A.2d at 1058 ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.")) (citations omitted).

[168] *Rural I*, 88 A.3d at 97.

[169] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (quoting *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1137 (D. Del. 1996)). *See Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) ("It is well-settled under both Delaware law and the law of most other jurisdictions that the *scienter* . . . requirement can be satisfied by a showing of recklessness. . . . 'There is of course no difficulty in finding the required intent to mislead where it appears that the speaker believes his statement to be false. Likewise there is general agreement that it is present when the representation is made without belief as to its truth, or with reckless disregard whether it be true or false.'") (internal citation omitted).

[170] *In re Oracle Corp.*, 867 A.2d 904, 931 (Del. Ch. 2004).

74

improper."[171]  Accordingly, the question of whether a defendant acted with *scienter* is a factual determination.[172]  The trial court found that, "[o]n the facts of this case, RBC acted with the necessary degree of *scienter* and can be held liable for aiding and abetting."[173]  The evidence supports this finding.

RBC knowingly induced the breach by exploiting its own conflicted interests to the detriment of Rural and by creating an informational vacuum.[174]  RBC's knowing participation included its failure to disclose its interest in obtaining a financing role in the EMS transaction and how it planned to use its engagement as Rural's advisor to capture buy-side financing work from bidders for EMS; its knowledge that the Board and Special Committee were uninformed about Rural's value; and its failure to disclose to the Board its interest in providing the winning bidder in the Rural process with buy-side financing and its eleventh-hour attempts to secure that role while simultaneously leading the negotiations on price.  RBC's desire for Warburg's business also manifested itself in its financial analysis, provided by RBC the day the Board approved the merger.  RBC's illicit manipulation of the Board's deliberative processes for self-interested purposes was enabled, in part, by the Board's own lack of oversight, affording RBC "the opportunity to

---

[171] *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (citing *Malpiede*, 780 A.2d 1075); *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) [hereinafter, "*Emerald Partners III*, 787 A.2d at __"]) (citation omitted).

[172] *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (stating that "[s]cienter is assuredly a 'fact'" (emphasis added)).

[173] *Rural I*, 88 A.3d at 97.

[174] *Cf. Encite LLC v. Soni*, 2011 WL 5920896, at *26 (Del. Ch. Nov. 28, 2011) (recognizing that a "plaintiff can prove knowing participation by showing that a [third party] 'attempt[ed] to create or exploit conflicts of interest in the board' or 'conspire[d] in or agree[d] to the fiduciary breach'") (citation omitted).

indulge in the misconduct which occurred."[175]  The Board was unaware of RBC's modifications to the valuation analysis, back-channel communications with Warburg, and eleventh-hour attempt to capture at least a portion of the acquirer's buy-side financing business.  RBC made no effort to advise the Rural directors about these contextually shaping points.  The result was a poorly-timed sale at a price that was not the product of appropriate efforts to obtain the best value reasonably available and, as the trial court found, a failure to recognize that Rural's stand-alone value exceeded the sale price.

RBC's failure to fully disclose its conflicts and ulterior motives to the Board, in turn, led to a lack of disclosure in the Proxy Statement.[176]  The Proxy Statement included materially misleading information that RBC presented to the Board in its financial presentation and omitted information about RBC's conflicts.

The manifest intentionality of RBC's conduct—as evidenced by the bankers' own internal communications—is demonstrative of the advisor's knowledge of the reality that the Board was proceeding on the basis of fragmentary and misleading information. Propelled by its own improper motives, RBC misled the Rural directors into breaching their duty of care, thereby aiding and abetting the Board's breach of its fiduciary obligations.[177]

---

[175] *Mills*, 559 A.2d at 1279.

[176] *See, e.g., Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 n.22 (Del. Ch. Jan. 25, 1999) (discussing disclosure of improper motives).

[177] SIFMA claims that it is internally inconsistent that a "victimized" board engaged in wrongdoing.  But the trial court held that the Board independently breached its duty of care in ways not caused by RBC.  One such example was the Board's failure to exercise appropriate oversight as to the unauthorized initiation of the sale process.  Certain other breaches were more directly the result of RBC's conduct.  *See, e.g., Rural II*, 102 A.3d at 239 ("The directors

## D. Proximate Cause

### 1. Contentions of the Parties

RBC contends that the court below improperly concluded that but for the financial advisor's actions the Board would not have breached its duty of care "and damaged Rural's stockholders by causing the Company to be sold at a price below its fair value."[178] RBC suggests that "Moelis's presence in [the Warburg] negotiations logically cuts the causal link relied upon by the trial court."[179] RBC similarly rests on the availability of Moelis's financial analysis to support its argument that the Court of Chancery erred in determining that RBC proximately caused the harm suffered by the Company's stockholders when voting in favor of the Warburg offer on the basis of the misleading and false Proxy Statement.[180]

### 2. Standard of Review

On appeal, this Court reviews the issue of proximate cause for clear error, as the question "is ordinarily a question of fact to be determined by the trier of fact."[181]

### 3. Discussion

Under Delaware law, a proximate cause is one "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without

---

breached their duties when approving the disclosures in the Proxy Statement and when approving the Merger, but they did so because RBC misled them, affirmatively in the case of the Disclosure Claim and both affirmatively and by omission during the final approval of the Merger.").

[178] *Rural I*, 88 A.3d at 101.

[179] Op. Br. 52.

[180] *Id.* at 54.

[181] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 830 (Del. 1995) (citations omitted).

which the result would not have occurred."[182] Our law "has long recognized that there may be more than one proximate cause of an injury."[183] To establish proximate cause, "a plaintiff must show that the result would not have occurred 'but for' the defendant's action."[184] Further, "[i]n order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor."[185] "[A] superseding cause is a new and independent act, itself a proximate cause of an injury, which breaks the causal connection between the original tortious conduct and the injury."[186] However, "[t]he mere occurrence of an intervening cause . . . does not automatically break the chain of causation stemming from the original tortious conduct."[187]

The Board's receipt of Moelis's financial analysis—which the Special Committee treated as "secondary" to that of RBC—does not remedy RBC's improper conduct, nor does it destroy the causal link between RBC's actions, the Board's failure to satisfy itself of its fiduciary obligations, and the harm suffered by the Company's stockholders.[188]

---

[182] *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000) (quoting *Duphily*, 662 A.2d at 829) (internal quotations omitted).

[183] *Jones v. Crawford*, 1 A.3d 299, 302 (Del. 2010) (quoting *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991)) (internal quotation omitted).

[184] *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 532 (Del. 1998) (citing *Money v. Manville Corp. Asbestos Disease Comp. Trust Fund*, 596 A.2d 1372, 1375-77 (Del. 1991); *Culver*, 588 A.2d at 1097).

[185] *Duphily*, 662 A.2d at 829 (citing *Stucker v. Am. Stores Corp.*, 171 A. 230, 233 (Del. 1934)).

[186] *Id.*

[187] *Id.*

[188] We acknowledge that obtaining the advice of a second bank is a common practice and that such practice can have a salutary effect on a sale process. *But see In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 840 (Del. Ch. 2012) (enjoining a sale transaction, despite the presence of two financial fairness opinions from two separate banks); *El Paso*, 41 A.3d at 434 (discussing the problematic entwinement of primary and secondary bank incentives); *In re Del Monte Foods*

Moelis was a secondary actor in the valuation process, and—like RBC—was compensated for its advisory role on contingent basis. RBC's argument that Moelis's presence cleansed the process falls short, in part, because the supposedly conflict-cleansing bank was paid on the same contingent basis as the primary bank. A contingent compensation arrangement that pays an advisor a percentage of the deal value can have the salutary effect of aligning the interests of the advisor with those of its client in attempting to obtain the best value. But there could be misalignment over whether to take a deal in the first instance, and divergence could arise over how to proceed during final negotiations.[189] Moelis's fairness opinion does not cure RBC's aiding and abetting of the Board's breach of the duty of disclosure. Here, the stockholders went to the ballot box on the basis of a deficient Proxy Statement, the insufficiency and misleading nature of which was due to RBC's failure to be forthcoming.

SIFMA submits that a claim for aiding and abetting a breach of the duty of care, if recognized by this Court, would create an anomalous imbalance of responsibilities where a non-fiduciary may be held liable for an unintentional violation of a fiduciary duty by a fiduciary. Here, these concerns are overstated since the claim for aiding and abetting was premised on RBC's "fraud on the Board," and that RBC aided and abetted the Board's

---

*Co. S'holders Litig.*, 25 A.3d 813, 826 (Del. Ch. 2011) (enjoining a transaction, despite a primary bank's provision of buy-side financing and correlative insistence that their client "obtain a second fairness opinion").

[189] The trial court found that certain changes made by Moelis to its valuation analysis were "debatable" and "had the effect of lowering the range of fairness and making the merger price look more attractive." *Rural I*, 88 A.3d at 77 n.1. But because Moelis settled, the trial court did not "delve into the minutiae of Moelis's work," and it did not make any findings as to why Moelis made these changes. *Id.*

breach of duty where, for RBC's own motives, it "intentionally duped" the directors into breaching their duty of care.[190] The record evidence amply supports the trial court's conclusion that RBC purposely misled the Board so as to proximately cause the Board to breach its duty of care. Accordingly, our holding is a narrow one that should not be read expansively to suggest that any failure on the part of a financial advisor to *prevent* directors from breaching their duty of care gives rise to a claim for aiding and abetting a breach of the duty of care.[191] Moreover, the requirement that the aider and abettor act

---

[190] *Goodwin*, 1999 WL 64265, at *28 (suggesting the availability of an aiding abetting claim where a "third-part[y], for improper motives of [its] own, intentionally dupe[s] . . . directors into breaching their duty of care").

[191] In affirming the principal legal holdings of the trial court, we do not adopt the Court of Chancery's description of the role of a financial advisor in M & A transactions. In particular, the trial court observed that "[d]irectors are not expected to have the expertise to determine a corporation's value for themselves, or to have the time or ability to design and carryout a sale process. Financial advisors provide these expert services. In doing so, they function as gatekeepers." *Rural I*, 88 A.3d at 88 (citations omitted). Although this language was *dictum,* it merits mention here. The trial court's description does not adequately take into account the fact that the role of a financial advisor is primarily contractual in nature, is typically negotiated between sophisticated parties, and can vary based upon a myriad of factors. Rational and sophisticated parties dealing at arm's-length shape their own contractual arrangements and it is for the board, in managing the business and affairs of the corporation, to determine what services, and on what terms, it will hire a financial advisor to perform in assisting the board in carrying out its oversight function. The engagement letter typically defines the parameters of the financial advisor's relationship and responsibilities with its client. Here, the Engagement Letter expressly permitted RBC to explore staple financing. But, this permissive language was general in nature and disclosed none of the conflicts that ultimately emerged. As became evident in the instant matter, the conflicted banker has an informational advantage when it comes to knowledge of its real or potential conflicts. *See* William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 36 (2014) ("The basic requirements of disclosure and consent make eminent sense in the banker-client context. The conflicted banker has an informational advantage. Contracting between the bank and the client respecting the bank's conflict cannot be expected to succeed until the informational asymmetry has been ameliorated. Disclosure evens the field: the client board has choices in the matter . . . and needs to make a considered decision regarding the seriousness of the conflict."). The banker is under an obligation not to act in a manner that is contrary to the interests of the board of directors, thereby undermining the very advice that it knows the directors will be relying upon in their decision making processes. Adhering to the trial court's amorphous "gatekeeper" language would inappropriately expand

with *scienter* makes an aiding and abetting claim among the most difficult to prove.[192]

Here, that standard was satisfied by the unusual facts proven at trial and which have not

been seriously challenged on appeal.

### E. The Trial Court Did Not Err in Calculating Damages

### 1. Contentions of the Parties

On appeal, RBC suggests that the Court of Chancery abused its discretion in

calculating damages by ignoring the results of a full auction and post-signing market

check and accepting an unreasonably inflated discounted cash flow as the sole evidence

of value. For her part, Jervis suggests that the Court of Chancery properly determined the

amount of damages suffered by the Class.

---

our narrow holding here by suggesting that any failure by a financial advisor to prevent directors from breaching their duty of care gives rise to an aiding and abetting claim against the advisor.

[192] *See, e.g., Malpiede*, 780 A.2d at 1097-98 (finding "that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that [the alleged aider and abettor] knowingly participated in a fiduciary breach"); *Santa Fe*, 669 A.2d at 72 (affirming the dismissal of an aiding and abetting claim); *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014) (quoting *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006)) (noting that "[k]nowing participation has been described as a 'stringent' standard that 'turn[s] on proof of *scienter*'") (emphasis added); *Morgan v. Cash*, 2010 WL 2803746, at *4-5 (Del. Ch. July 16, 2010) (granting a motion to dismiss predominantly on the basis that knowing participation was not established); *Katell v. Morgan Stanley Grp., Inc.*, 1993 WL 106067, at *1 (Del. Ch. Mar. 29, 1993) (denying plaintiffs' requests for reargument and modification following a finding that "plaintiffs failed to allege specifically the third element, namely facts from which it can be reasonably be inferred that [the alleged aiders and abettors] knowingly participated" in the breach). *See also El Paso*, 41 A.3d at 448 (stating that "it is difficult to prove an aiding and abetting claim") (citations omitted); *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Aug. 18, 2009) ("The standard for an aiding and abetting claim is a stringent one, one that turns on proof of *scienter* of the alleged abettor.") (emphasis added); *Allied Capital*, 910 A.2d at 1039 ("[T]he test for stating an aiding and abetting claim is a stringent one . . . ."); Bratton & Wachter, *Bankers and Chancellors*, 93 TEX. L. REV. at 62-63 n.356 (suggesting that, for an aiding and abetting claim, "[t]he plaintiff must meet a *scienter* requirement, proving not only the existence and breach of a fiduciary relationship but the defendant's knowing participation in the breach[,]" and that "[t]hese claims accordingly are thought to be hard to prove") (emphasis added) (citations omitted).

## 2. Standard of Review

We review findings as to damages by the Court of Chancery for an abuse of discretion.[193] "The Court of Chancery has the . . . power 'to grant such . . . relief as the facts of a particular case may dictate.'"[194]

## 3. Discussion

The Court of Chancery determined that the Class was entitled to compensatory damages in the amount of $4.17 per share.[195] Relying, in part, on this Court's holding in *Weinberger v. UOP, Inc.*, the Court of Chancery undertook to discover the "fair value" or "intrinsic value" of the shares held by the Class "using the same methodologies employed in an appraisal [proceeding]. . . ."[196]

As part of *Rural I*, the trial court adopted the discounted cash flow model presented by Jervis's expert as the general framework for the valuation analysis. Further, the trial court ordered revised expert analyses "extending" Rural's management projections and employing the projections that Jervis's expert advanced, reasoning that "DiMino and his team prepared reliable projections based on the business plan that he developed and the Board adopted."[197] Accounting for DiMino's aggressive acquisition program was problematic, however. The Court of Chancery concluded that

---

[193] *Gotham Partners, L.P. v. Hallwood Realty Partners,* 817 A.2d 160, 175 (Del. 2002) (citing *Weinberger v. UOP, Inc.* 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Int'l Telecharge, Inc. v. Bomarko, Inc.* 766 A.2d 437, 439 (Del. 2000) (noting that this Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy")).

[194] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1251 (Del. 2012) (quoting *Weinberger*, 457 A.2d at 714).

[195] *Rural II*, 102 A.3d at 224.

[196] *Id.* 224-25 (citations omitted).

[197] *Rural I*, 88 A.3d at 107.

"[n]ormalizing the EBITDA figure or adjusting the terminal value multiple requires assumptions about the future states of the world, but those assumptions are hidden in altered numbers."[198] For that reason, the trial court ordered the revised analyses to extend the projections and employ those that were set out by Jervis's expert, noting that "the technique of extending the projections deals with the valuation difficulties more forthrightly by making its assumptions explicitly and enabling them to be evaluated and tested."[199]

The Court of Chancery, in *Rural I*, also resolved a series of disputes stemming from the methodologies employed by the parties' experts at trial. It concluded that the standard capital asset pricing model "that adds a size premium to reflect the superior historical performance of smaller companies" should be used to determine the discount rate.[200] The trial court also ordered that the revised expert submissions incorporate two calculations, "one using the historical equity risk premium and another using the supply side equity risk premium."[201] Finally, in *Rural I*, the Court of Chancery ordered that the experts recalculate beta using Jervis's expert's method, which derived beta from "weekly data measured against the S & P 500 for two years," as opposed to the method set forth by RBC's expert that "used monthly measurements and a five year look-back period."[202] In so ordering, the Court of Chancery reasoned that "both are acceptable methods. In this specific case, both measures are problematic because the reliability of an observed beta

---

[198] *Id.* at 108.
[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*

83

depends on an efficient trading market."[203]  According to the trial court, Rural's stock did not achieve market efficiency "on a reasonably consistent basis until the second week of September 2009."[204]  Thus, it ordered a measuring period from September 11, 2009 to March 25, 2011.

In *Rural II*, upon receipt of the revised expert opinions and based on the evidence presented at trial, the Court of Chancery determined to use a beta of 1.199, because "[t]he beta calculated as instructed in [*Rural I* was] 1.147, which [was] lower than the figure advocated by [Jervis's expert].  To avoid awarding value beyond what [Jervis] sought, [*Rural II*] use[d]" the beta advanced by Jervis's expert.[205]  In *Rural II*, the trial court adopted "the compromise position of giving equal weight to the supply side and historical equity risk premiums" and employed 3.7% as the perpetuity growth rate, which was the low end of the range advanced by RBC's expert.[206]

The Court of Chancery concluded that the "quasi-appraisal value for Rural as of the Merger date [was] $21.42 per share.  The members of the Class received $17.25 in the Merger and therefore suffered damages of $4.17 per share."[207]  It also determined, in *Rural I*, that "exclusive reliance on the negotiated deal price [was] inappropriate" in its

---

[203] *Id.* at 108-09 (internal citation omitted).

[204] *Id.* at 109.  In reaching its conclusion with respect to market efficiency, the trial court suggested:  "For a company like Rural that is traded on a major exchange, '[t]urnover measured by average weekly trading of . . . 1% would justify a substantial presumption' of market efficiency."  *Id.* (quoting 5 Bromberg et al., *Bromberg & Lowenfels on Securities Fraud* § 7:484 (2d ed. 2003)).

[205] *Rural II*, 102 A.3d at 225-26.

[206] *Id.* at 226.

[207] *Id.*

attempt to determine damages,[208] in part, because, "[w]hen the sale process started, the market did not understand Rural's prospects."[209]  Further, the trial court determined that "RBC's faulty [sale process] design prevented the emergence of the type of competitive dynamic among multiple bidders that is necessary for reliable price discovery. . . .  If RBC had not run the Rural process in parallel with the EMS process, other private equity players with . . . large funds [equal to that of Warburg] could have participated, forcing up the price."[210]  Similarly, the competitive dynamic was inhibited by the fact that potential strategic bidders for Rural were themselves tied up in change of change of control transactions at the time the Company was exploring a sale.

In *Americas Mining Corp. v. Theriault*, we explained that, "[i]n making a decision on damages, or any other matter, the trial court must set forth its reasons.  This provides the parties with a record basis to challenge the decision.  It also enables a reviewing court to properly discharge its appellate function."[211]  Here, the Court of Chancery explained the reasons for its calculation of damages in great detail.  The trial court applied the quasi-appraisal remedy to conclude that Rural's stockholders were denied $4.17 per share in the Warburg deal.  In addition to an actual award of monetary relief, the Court of Chancery had the authority to grant pre- and post-judgment interest, and to determine the

---

[208] *Rural I*, 88 A.3d at 102.
[209] *Id.*
[210] *Id.* at 103.
[211] *Theriault*, 51 A.3d at 1251.

85

form of that interest.[212]  Here, the court below awarded pre- and post-judgment interest at the legal rate, running from June 30, 2011 until the date of payment.[213]

The record reflects that the Court of Chancery properly exercised its broad discretionary powers in fashioning a remedy and making its award of damages.  The trial court's judgment awarding damages is, accordingly, affirmed.[214]

## F.  DUCATA

### 1.  Contentions of the Parties

RBC does not question the applicability of the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA"), but rather the manner in which the Court of Chancery applied it.  RBC's arguments can be summarized as follows:  (1) the Court of Chancery erred by failing to allocate fault on a *pro rata* basis as required by Section 6304 of DUCATA; (2) the trial court erred by denying RBC a fair chance to prove that other parties to the transaction were joint tortfeasors; (3) the trial court erred in holding that the burden rested with Jervis to demonstrate that the other defendants were joint tortfeasors; (4) the trial court should not have invoked the doctrine of unclean hands; and (5) quasi-estoppel should apply.  For her part, Jervis unconditionally defends the trial court's application of DUCATA.

After applying DUCATA to the breach of the duty of care by the Rural directors, the Court of Chancery concluded that (1) the total damages suffered by the Class

---

[212] *Id.* at 1252 (citing *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)).

[213] *Rural II*, 102 A.3d at 214.

[214] We affirm the trial court's December 17, 2013 Memorandum Opinion excluding the Farber Declaration from the record for purposes of post-trial decision.

amounted to $91,323,554.61; (2) two of the settling defendants, Shackelton and DiMino, were joint tortfeasors who breached their duty of loyalty and bore a 17% share of the responsibility for the damages suffered by the Class; and (3) RBC was responsible for 83% of the damages, or $75,798,550.33, *plus* pre- and post-judgment interest at the legal rate from June 30, 2011 until the date of payment.

## 2. Standard of Review

This Court reviews the Court of Chancery's conclusions of law *de novo*.[215] However, we afford a trial court's factual findings a "high level" of deference,[216] and will leave such conclusions undisturbed unless they are the by-product of clear error.[217]

## 3. Discussion

### i. The Court of Chancery Properly Allocated Fault on a Pro Rata Basis

Pursuant to DUCATA, this State recognizes the right of contribution among joint tortfeasors.[218] The trial court determined that RBC, Shackelton, and DiMino qualified as joint tortfeasors. By DUCATA's terms, "[a] joint tortfeasor is not entitled to a money judgment for contribution until he or she has by payment discharged the common liability or has paid more than his or her *pro rata* share thereof."[219] Stated otherwise, a joint tortfeasor cannot obtain contribution from another tortfeasor until the tortfeasor seeking

---

[215] *Unitrin*, 651 A.2d at 1385.

[216] *United Techs.*, 109 A.3d at 557 (quoting *DV Realty Advisors*, 75 A.3d at 108) (internal quotation omitted).

[217] *DV Realty Advisors*, 75 A.3d at 108 (citing *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 219 (Del. 2005)) (holding that this Court "will not set aside a trial court's factual findings 'unless they are clearly wrong and the doing of justice requires their overturn'").

[218] 10 *Del. C.* § 6302(a). On appeal, the parties have assumed that DUCATA applies to breaches of fiduciary duty—an issue of first impression in this Court. We find no error in the trial court's conclusion that DUCATA is applicable.

[219] *Id.* at § 6302(b) (emphasis added).

87

contribution has satisfied its common liability as to the plaintiff or made payment in excess of its relative fault.

Further, Section 6302(d) of DUCATA provides that "[w]hen there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their *pro rata* shares."[220] That is to say, when one joint tortfeasor's culpability meaningfully exceeds another's, the more culpable of the two may properly be required to account to the plaintiff for its higher degree of fault. Section 6306(d) modifies this concept by providing: "[a]s among joint tortfeasors against whom a judgment has been entered in a single action, § 6302(d) of this title applies only if the issue of proportionate fault is litigated between them by cross-complaint in that action."[221]

Here, the Settlement Agreement—to which RBC did not object—bars any claims against the settling defendants for contribution. Further, it expressly provides that, pursuant to 10 *Del. C.* § 6304(b), the damages recoverable against the non-settling defendant RBC "will be reduced to the extent of the *pro rata* shares, if any, of Moelis and the Rural/Metro Defendants."[222] Accordingly, while its claims for contribution were barred, RBC retained the opportunity to claim a judgment reduction under 10 *Del. C.* § 6304(b). In this regard, it contends that its damages should have been reduced by the appropriate *pro rata* share of the seven settling defendants. It further maintains that of

---

[220] *Id.* at § 6302(d) (emphasis added).
[221] *Id.* at § 6306(d).
[222] A3071.

the eight total defendants, each should have been allocated an equal 12.5% share.  Thus,

RBC claims it should have received a settlement credit under 10 *Del. C.* § 6304(b) equal

to 87.5% of the damages, with RBC remaining liable only for the 12.5% of the total

damages.

The Court of Chancery properly determined that "DUCATA uses the term '*pro*

*rata*' to mean 'proportionate,' which is the plain meaning of the term."[223]  The United

States Supreme Court has also recognized the term "*pro rata*" to mean "proportionate:"

"Some courts have adopted the concept of a *pro-rata* recovery . . . .   Under this

procedure, damages are distributed . . . on a *proportional* basis . . . ."[224]  This Court has

also interpreted *pro rata* to mean "proportionate."[225]

The trial court assigned 83% of the responsibility for the damages to the Class to

RBC.  In so doing, it reasoned that the Sale Process Claim and the Disclosure Claim "can

be weighted equally on the premise that each led to the same injury."[226]  Because RBC

---

[223] *Rural II*, 102 A.3d at 261 (citing AMERICAN COLLEGE DICTIONARY 1098 (3d ed. 1993) (defining "*pro rata*" as "[i]n proportion; according to a factor that can be calculated exactly"); BLACK'S LAW DICTIONARY 1340 (9th ed. 2009) ("proportionately")).

[224] *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 718 n.15 (1974) (emphasis added).  *See also Seatrain Shipbuilding Co. v. Shell Oil Co.*, 444 U.S. 572, 590-91 (1980) (using "proportionate" and "*pro rata*" interchangeably).

[225] *See, e.g., Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1260 n.22 (Del. 2010) (noting that "a *pro rata* approach spreads the loss and assigns liability on a *proportionate* basis") (emphasis added); *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) (examining proportionate *pro rata* recovery); *Universal Underwriters Ins. Co. v. Travelers Ins. Co.*, 669 A.2d 45, 49 (Del. 1995) (discussing the "equitable underpinnings" of "a proportionate or *pro rata* allocation"); *Ikeda v. Molock*, 603 A.2d 785, 786-87 (Del. 1991) (using "*pro rata*" to mean "proportionate" and discussing the proration of liability "based upon *proportionate* fault") (emphasis added).

[226] *Rural II*, 102 A.3d at 262.  The Court of Chancery also suggested that "RBC was solely responsible for the Disclosure Claim, which could be viewed as an independent cause of the damages suffered by the Class and justify imposing 100% of the damages on RBC." *Id.*

was "the party solely responsible for the Disclosure Claim," the Court of Chancery allocated 50% of the responsibility for the total damages suffered by the Class to RBC.[227] As to the Sale Process Claim, which accounted for the remaining portion of the damages suffered, the trial court suggested that the "breaches of duty that occurred when Shackelton and RBC initiated the sale process . . . and the breaches of duty that occurred during the final approval" of Warburg's offer "can be weighted equally."[228] Applying the unclean hands doctrine, the trial court determined that "RBC cannot seek contribution and is not entitled to any settlement credit for the breaches of duty that occurred during the final approval of the Merger. RBC is therefore allocated an additional 25% of the responsibility for the damages suffered by the Class to account for the breaches that took place during the final approval."[229] We agree with the trial court's *pro rata* allocation of fault.

### ii. RBC Had a Fair Chance to Prove that Other Parties to the Transaction were Joint Tortfeasors

RBC contends that "Section 6306(d) requires actual litigation between the joint tortfeasors before proceeding on anything other than a *pro rata* basis."[230] This Court has stated that "when one or more pretrial settlements have occurred, joint tort[]feasor status

---

[227] *Id.*

[228] *Id.*

[229] *Id.* The trial court allocated the remaining 25% of the Sale Process Claim as follows: 10% to Shackelton, 8% to RBC, and 7% to DiMino.

[230] Op. Br. 63 (emphasis added).

is . . . resolved judicially by submitting the liability of a settling defendant to the trier of fact for a determination."[231]

In *Ikeda v. Molock*, we held, in the context of Section 6306(d), that "the filing of a cross-claim is a prerequisite to the apportionment of liability between joint tort[]feasors based upon relative degrees of fault."[232] Here, RBC filed a cross-claim against the settling defendants, who "remained parties to the action for purposes of trial after the agreements in principle were reached."[233] *Ikeda* stands for the proposition that "[a] jury may not properly fulfill its role as trier of fact unless the questions to be decided by the jury are litigated at trial."[234] Given that this case involved a bench trial, however, RBC acknowledges that the Court of Chancery correctly determined that RBC did not waive its right to argue during post-trial proceedings that the settling defendants were joint tortfeasors. But it urges that the trial court erred by requiring RBC to litigate its contribution claims upon "the record created at trial and in light of the factual findings" in the trial court's opinion adjudging liability.[235] It contends that such limitation was particularly unfair where the defendants had asserted a common interest privilege during the litigation.

To the extent that RBC claims prejudice due to the timing of the eve-of-trial settlements between the plaintiffs and all other defendants, that is simply a function of RBC being the last non-settling defendant. This situation does not relieve RBC of its

---

[231] *Med. Ctr. of Del., Inc. v. Mullins*, 637 A.2d 6, 10 (Del. 1994) (internal citation omitted).
[232] *Ikeda*, 603 A.2d at 787.
[233] *Rural II*, 102 A.3d at 248.
[234] *Ikeda*, 603 A.2d at 787.
[235] *Rural II*, 102 A.3d at 245.

91

burden to prove the joint tortfeasor status of the other defendants. After the agreements in principle were reached, the settling defendants remained parties to the action for purposes of trial. RBC had the opportunity to develop a record in support of its contribution claims at trial. Three of the individual defendants testified at trial. RBC could have issued trial subpoenas as to the others. RBC was permitted to file a post-trial brief in support of its contribution defenses.[236] Further, the settling defendants were not released from the case until six months after trial and RBC did not object to the settlement or to the entry of the Partial Final Judgment.[237]

RBC also contends that it "seeks only Section 6304(b) judgment reduction[,]" and that Section 6302(d)'s allowance for disproportionate fault applies only with respect to claims for contribution. Thus, it claims that disproportionate fault may not be considered under Section 6304(b). Yet, RBC's contention is based upon its view—which we reject—that *pro rata* must mean "equal." We also reject RBC's contention that the trial court erred in finding that the settling directors were not joint tortfeasors. Section 6301 defines "joint tortfeasors" as "2 or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Because of the operation of Rural's Section 102(b)(7) exculpatory provision, the director defendants would not be liable for money damages.

---

[236] A2903-2956.

[237] In RBC's amended answer, dated May 2, 2013, RBC asserted cross-claims against Moelis and the individual defendants. RBC's cross-claim did not actually allege any wrongdoing by the individual defendants or Moelis that could give rise to liability to the Class. B1058.

Nor would the settling defendants be "tortfeasors" as a result of the settlement. In *Medical Center of Delaware, Inc. v. Mullins*,[238] we concluded that a release providing for a reduction in a plaintiff's recovery in accordance with Section 6304 does not establish a settling defendant as a joint tortfeasor by its nature.[239] In other words, a release, absent an admission, is insufficient to establish a settling defendant as a joint tortfeasor. As the Court of Chancery observed, DUCATA applies only to joint tortfeasors. Moelis and the settling members of the Rural Board were not adjudicated joint tortfeasors, nor did the Settlement Stipulation[240] or Partial Final Judgment contain an admission of liability establishing them as such. Accordingly, here, as in *Mullins*, the applicable release predicated any settlement reduction upon an adjudication of the settling defendants' liability as joint tortfeasors. Thus, the trial court correctly concluded that the settlement did not establish the joint tortfeasor status of the settling defendants.

As to RBC's suggestion that the doctrine of quasi-estoppel bars Jervis from asserting that neither the Board nor Moelis were joint tortfeasors, it is mistaken. Under Delaware law, the doctrine of quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or

---

[238] 637 A.2d 6 (Del. 1994).

[239] *Id.* at 8-9.

[240] The Settlement Stipulation provided: "Pursuant to 10 *Del. C.* § 6304(b) the damages recoverable against non-settling defendant RBC and any other alleged tortfeasor will be reduced to the extent of the *pro rata* shares, if any, of Moelis and the Rural/Metro Defendants." A3071 (emphasis added). The settling defendants expressly denied "any and all allegations of wrongdoing, fault, liability or damages."

93

produced some disadvantage to another."[241]  In *Mullins*, the plaintiff was permitted to assert liability against all defendants, settle with a subset of the defendants, and maintain, for the purposes of the contribution claims, that the non-settling defendant was not negligent.  We decline to hold that Jervis is estopped from disputing the joint tortfeasor status of the settling defendants in the similar circumstances presented here.  We do not find Jervis's shift in litigation position to be unconscionable.  Rather, it is a predictable consequence of settling the case as to all other defendants.[242]

### iii.  Rural's Section 102(b)(7) Exculpatory Provision Does Not Shield RBC

RBC challenges, on both legal and policy grounds, the trial court's conclusion that Rural's Section 102(b)(7) exculpatory provision precluded contribution from the defendant directors:   (1) from a legal perspective, RBC claims that the trial court improperly asserted the Board's 102(b)(7) defense on their behalf; and (2) from a policy perspective, duty of care exculpatory provisions, according to RBC, are intended to eliminate liability, not shift it.  We address both arguments, in turn.  In so doing, we affirm the trial court's holding, but not necessarily its reliance on Delaware decisions construing the Delaware Guest Statute and Delaware's Tort Claims Act.[243]

---

[241] *Bank of N.Y. Mellon v. Commerzbank Capital Funding Trust II*, 2011 WL 3360024, at *8 n.71 (Del. Ch. Aug. 4, 2011) (quoting *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008)) (internal quotations omitted).  *See also Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013) ("Under the doctrine of quasi-estoppel, the Court may 'preclude[] a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken.'   A party does not need to show reliance for quasi-estoppel to apply.") (citations omitted).

[242] *Cf. Fins v. Pearlman*, 424 A.2d 305, 309 (Del. 1980) ("Settlements are encouraged because they voluntarily resolve disputed matters.").

[243] *See Rural II*, 102 A.3d at 249-52.  In performing its 8 *Del. C.* § 102(b)(7) analysis, the trial court analogized exculpation under Section 102(b)(7) to the Delaware Guest State, as discussed

"The statutory enactment of Section 102(b)(7) was a logical corollary to the

common law principles of the business judgment rule. Since its enactment, Delaware

courts have consistently held that the adoption of a charter provision, in accordance with

Section 102(b)(7), bars the recovery of monetary damages from directors for a successful

shareholder claim that is based exclusively upon establishing a violation of the duty of

---

in *Lutz v. Boltz*, 100 A.2d 647 (Del. Super. 1953), and Delaware's Tort Claims Act, as discussed in *N.Z. Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F. Supp. 1180 (D. Del. 1993). In *Kiwifruit*, the District Court distinguished cases where the operation of law prevents one of the co-defendants from being held liable to the plaintiff:

> [W]here one party is immune from suit by operation of law, as is true in guest statute, spousal immunity, or workers compensation cases, courts have found that the party who is, by law, immune from suit cannot have shared a "common liability. . . ." [H]owever, where suit against one party is merely barred by the statute of limitations, courts have found that the "common obligation which is essential to the right of one to contribution is the showing that the fellow tort[]feasor at some time was liable with him for damage. . . . [There is] no reason why the law should let action or inaction of the injured party defeat a claim for contribution."

825 F. Supp. at 1186-87 (internal citation omitted) (emphasis removed). Here, the policies that underlie Section 102(b)(7) are different from those that underlie the Guest Statute or Tort Claims Act. Section 102(b)(7) operates differently from the Guest Statute or Tort Claims Act, in that it does not bar all relief, even for breaches of the duty of care. *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1181 n.32 (Del. 2015) (noting that Section 102(b)(7) may not have a case-dispositive effect in cases where equitable relief, such as rescission, is sought); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 535 n.2, 542 (Del. 1996) (stating that "[u]nder 8 *Del. C.* § 102(b)(7), directors are not exempt from equitable relief . . ." and that directors are not exempt from equitable relief under Section 102(b)(7) in the context of a post-merger lawsuit where stockholders alleged direct claims against the corporation). The present situation is unlike the case where suit against one party is barred due to some conduct by the plaintiff, *e.g.*, a statute of limitations. Rather, the operation of a statutory provision, Section 102(b)(7), bars recovery of money damages. Because there could be no liability at least as to that form of relief—which is the only relief sought here—we agree with the trial court's decision to deny RBC contribution from the defendant directors.

95

care."[244]   This Court, in *In re Cornerstone Therapeutics Inc. Stockholder Litigation*, recently repeated our recognition that "[t]he purpose of Section 102(b)(7) [is] to 'free[] up directors to take business risks without worrying about negligence lawsuits.'"[245]

One of the primary policy motivations impelling Section 102(b)(7)'s adoption was—and continues to be today—the elimination of liability "for potentially value-maximizing business decisions . . . ."[246]   However, in the case now before us, Rural's exculpatory charter provision is operating as intended:  to exculpate the directors from monetary damage liability for a breach of the duty of care.  Accordingly, the Company's Section 102(b)(7) provision did not vitiate the Board's obligation to adhere to its fiduciary obligation to proceed with due care, it simply proscribed monetary liability in the event that they failed to do so.  RBC's knowing and intentional inducement of the fiduciary breach justifies the award of damages in this matter, and such award is neither inequitable nor contrary to the policies underlying Section 102(b)(7).

Importantly, while Section 102(b)(7) insulates directors from monetary damages stemming from a breach of the duty of care, its protection does not apply to third parties such as RBC.  As the Court of Chancery observed, "[t]he literal language of Section 102(b)(7) only covers directors; it does not extend to aiders and abettors."[247]   Our Legislature did not intend for Section 102(b)(7) to safeguard third parties and thereby

---

[244] *Emerald Partners III*, 787 A.2d at 91 (citing *Malpiede*, 780 A.2d at 1095; *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999); *Zirn II*, 681 A.2d at 1061-62; *Arnold I*, 650 A.2d at 1288).
[245] *Cornerstone*, 115 A.3d at 1185 (quoting *Malpiede*, 780 A.2d at 1095).
[246] *Id.*
[247] *Rural I*, 88 A.3d at 86 (citations omitted).

create a perverse incentive system wherein trusted advisors to directors could, for their own selfish motives, intentionally mislead a board only to hide behind their victim's liability shield when stockholders or the corporation seeks retribution for the wrongdoing. RBC cannot essentially commit a fraud upon the very directors who hired and relied upon it, and subsequently seek to exploit the Board's exculpatory provision.

RBC urges that the trial court's application of the interplay of DUCATA and Section 102(b)(7) results in an erroneous and inequitable shifting of liability, and further underscores why this Court should not recognize a cause of action for aiding and abetting a board's breach of its duty of care. The argument is that, unless reversed, stockholders—who voted to place such exclusions from liability in their corporate charters—would be able to shift damages from the fiduciaries (directors), who are primarily liable but who are statutorily immunized from a damages claim, to a non-fiduciary (and non-immunized) third party (financial advisor). They suggest that this interpretation of DUCATA causes the financial advisor to bear a disproportionate and inequitable share of the liability and essentially makes financial advisors sureties for grossly negligent directors who may approve M & A transactions with no risk of liability to the directors themselves. Stated another way, had they not settled, the directors would have enjoyed protection from damages under Section 102(b)(7); the trial court declined to extend this protection to RBC, and so RBC was liable for damages for aiding and abetting the directors' breach of due care where the directors themselves would not have been liable for damages.

97

We reject RBC's contention that the trial court erred by considering the impact of Section 102(b)(7).[248] We find no error in the trial court's determination that RBC had the burden to show that the directors would not have been exculpated and that, but for the settlement, they would have shared a common liability to the Class. As for the directors who were not entitled to exculpation, as in the case of DiMino and Shackelton, RBC was properly given a credit under DUCATA.

Nor is the result here inequitable. The trial court properly determined that RBC's conduct accounted for a disproportionate amount of the fault. Further, the law provides third-party advisors, like RBC, a benefit not available to directors. That is, if an advisor acts with gross negligence, that will not be sufficient for a finding of aiding and abetting liability. Rather, plaintiffs must prove that the advisor acted with *scienter*. If an advisor knowingly induces directors to breach their duty to act reasonably under *Revlon*, the advisor is liable but only under a more stringent standard for imposing liability than a director faces when the director is not protected by a Section 102(b)(7) provision. In essence, the aider and abettor standard affords the advisor a form of protection by insulating it from liability unless it acts with *scienter*.

### iv. The Court of Chancery Did Not Err in Applying the Doctrine of Unclean Hands

RBC asserts that the Court of Chancery erroneously relied upon the doctrine of unclean hands to preclude the bank from seeking contribution "for the Disclosure Claim or for the aspect of the Sale Process Claim relating to the final approval of the

---

[248] The director defendants raised 8 *Del. C.* § 102(b)(7) in their Opening Pre-Trial Brief and Answering Pre-Trial Brief. *See* B795; B811-12; B902-04. The plaintiff also raised 8 *Del. C.* § 102(b)(7) in her Answering Post-Trial Contribution Brief. *See* A2963; A2984; A2988-91.

Merger."[249]   In *Rural II*, the Court of Chancery held that "the doctrine of unclean hands bars RBC from claiming the settlement credit to the extent RBC perpetrated" a fraud on the board.[250]

The doctrine of unclean hands is "[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of [a] transaction at issue must be denied equitable relief . . ., a rule which in conventional formulation operated *in limine* to bar the suitor from invoking the aid of the equity court . . . ."[251]   This Court has said before that "[t]he Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."[252]   Further, "[t]he question of unclean hands is factual, and our review will be limited to an inquiry as to whether the findings below support the conclusion that" RBC had unclean hands.[253]

Based upon our review of the record before us, the trial court correctly concluded that "RBC forfeited its right to have a court consider contribution" for the Disclosure and Sale Process Claims "by committing fraud against the very directors from whom RBC would seek contribution."[254]   We agree with the trial court's reasoning that if RBC were permitted to seek contribution for these claims from the directors, then RBC would be taking advantage of the targets of its own misconduct.   By contrast, RBC was

---

[249] Op. Br. 66-67 (quoting *Rural II*, 102 A.3d at 239) (internal quotation omitted).

[250] *Rural II*, 102 A.3d at 238 (citing *Mills*, 559 A.2d at 1283).

[251] *McKennon v. Nashville Banner Publ'g. Co.*, 513 U.S. 352, 360 (1995) (internal citation omitted).

[252] *SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del. 2000) (citing *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998) ("[T]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine [of unclean hands].")) (citations omitted).

[253] *Collins v. Burke*, 418 A.2d 999, 1004 (Del. 1980).

[254] *Rural II*, 102 A.3d at 239.

appropriately allowed to claim a credit for the aspect of the Sale Process Claim that did not involve misrepresentations and omissions by RBC towards its co-defendants.

### G. Fee Shifting

#### 1. Contentions of the Parties

On February 12, 2015, the Court of Chancery denied Jervis's application for fee shifting. She now contends that the trial court improperly concluded that the bad faith exception to the American Rule mandated a finding of "glaring egregiousness" in order to shift attorneys' fees.[255] Jervis, instead, suggests that the standard for fee shifting under this exception "is met in light of the Court of Chancery's factual findings respecting RBC's knowingly false factual representations in its pre-trial papers . . . ."[256] On the other hand, RBC asserts that the Court of Chancery correctly applied the "glaring egregiousness" standard to the exception, and that Jervis failed to set forth clear evidence that RBC engaged in bad faith litigation conduct.

#### 2. Standard of Review

When reviewing an award or denial of attorneys' fees under exceptions to the American Rule, this Court determines whether the trial court abused its discretion.[257] "We do not substitute our own notions of what is right for those of the trial judge if that

---

[255] Ans. Br. 75.
[256] *Id.*
[257] *See Dobler*, 880 A.2d at 227 (citing *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[258]

### 3. Discussion

"Under the American Rule, absent express statutory language to the contrary, each party is normally obligated to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[259] We have previously recognized, however, the bad faith exception to the rule.[260] Recently, we observed that this exception is premised on the theory that "when a litigant imposes unjustifiable costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct."[261]

"[A]n award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action."[262] Further, "[t]he bad faith exception applies only in extraordinary cases, and the party seeking to invoke that

---

[258] *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) (citing *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006)).

[259] *Johnston*, 720 A.2d at 545 (citation omitted).

[260] *See, e.g., Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Trust*, 117 A.3d 549, 558-560 (Del. 2015); *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del. 2012); *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607-08 (Del. 2010); *Johnston*, 720 A.2d at 546; *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005).

[261] *Blue Hen*, 117 A.3d at 559-560 (citing *Brice v. State, Dep't of Correction*, 704 A.2d 1176, 1179 (Del. 1998) ("The purpose of this exception is not to award attorney[s'] fees to the prevailing party as a matter of right, but rather to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'") (internal citation omitted)) (citation omitted).

[262] *Versata*, 5 A.3d at 607 (quoting *Johnston*, 720 A.2d at 546) (internal quotation omitted).

exception must demonstrate by clear evidence that the party from whom fees are sought . . . acted in subjective bad faith."[263] Our courts have not settled on a singular definition of bad faith litigation conduct, but "'have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims.'"[264] Further, we have recognized the bad faith exception where a party is found to have "mis[led] the court, alter[ed] testimony, or chang[ed] position on an issue."[265]

During its ruling from the bench, the trial court cited to several instances of what it believed to be potentially demonstrative of RBC's bad faith litigation conduct arising throughout the proceeding below. In sum, the Court of Chancery determined that RBC made intentional and misleading misstatements of fact in its briefs and at trial. The trial court suggested that RBC's bad faith litigation conduct touched upon its failure to appropriately characterize its staple financing efforts;[266] the interactive dynamic between its financing and M & A teams;[267] and, perhaps most problematically, the nature of its pursuit of Warburg's buy-side financing business.[268] Despite the fact that these misrepresentations struck at central issues before the Court of Chancery for adjudication, the trial court concluded that fee shifting was not warranted because RBC's

---

[263] *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) (internal quotations omitted) (citation omitted). *See also Dover Historical Soc'y, Inc*, 902 A.2d at 1093 ("Delaware courts have the power to shift attorneys' fees where a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.") (internal quotation omitted) (citation omitted).

[264] *Gatz Props.*, 59 A.3d at 1222 (quoting *Johnston*, 720 A.2d 542 at 546).

[265] *Dover Historical Soc'y*, 902 A.2d at 1093 (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850-51 (Del. Ch. 2005)) (internal quotation omitted).

[266] Ans. Br. Ex. A. Tr. 69:5-22 (Feb. 12, 2015).

[267] *Id.* at 69:23-70:6.

[268] *Id.* at 70:7-72:5.

misstatements did not cross the threshold of "glaring egregiousness."[269]  Indeed, the trial court remarked that RBC's actions were "aggressive" and "problematic."[270]

For example, RBC's Munoz did not admit until redirect questioning on the second day of trial that RBC had been lobbying Warburg on Saturday, March 26, 2011, seeking a role in the buy-side financing.  That admission stood in sharp contrast to various statements in RBC's pre-trial briefing, including the following:

- "RBC was not asked to provide a fairness opinion until after it was clear that there would be no staple financing."[271]

- "Warburg made clear that it would not use RBC's financing, hence RBC had no incentive to favor Warburg, and there is no record of RBC favoring any bidder."[272]

- "By March 23, 2011, RBC and the Special Committee were aware that RBC would not be providing staple financing for the Transaction."[273]

- "Furthermore, RBC could not have been motivated to find the Transaction fair, as it knew it would not be providing staple financing to Warburg *before* Rural/Metro requested a fairness opinion."[274]

- "[T]he record makes clear that RBC did not start on its fairness analysis until it was clear that RBC would not be financing the Warburg deal and it was thus likely that Rural/Metro would be requesting a fairness opinion."[275]

- "RBC knew that Warburg had 100% financing in place for the Transaction, and that it would not make sense for RBC to pursue Warburg regarding staple financing."[276]

---

[269] *Id.* at 72:22.
[270] *Id.* at 72:20-21.
[271] B737.
[272] A1932.
[273] A1944.
[274] A1960 (emphasis in original).
[275] A2033.
[276] A2034.

- "The RBC team offering the staple financing was distinct and separate from the RBC team advising Rural/Metro on the sale of the Company."[277]

- "Unlike *Del Monte*, RBC was not secretly meeting with Warburg without Rural/Metro's consent."[278]

As to the last example, the Court of Chancery noted:

> And then there's a footnote 133 on page 32 of the brief: 'Unlike *Del Monte*, RBC was not secretly meeting with Warburg without Rural/Metro's consent.' That one I find troubling. That's also on the borderline of where you get aggressive advocacy. So one could argue that technically that statement was true, because RBC allegedly obtained this blanket consent in its engagement letter. But I think the record at trial established that the Board wasn't aware and was never told about the final full-court press.
>
> It's those statements that essentially deny the existence of the final push for financing that I think could potentially warrant some type of fee shifting award. And I think that because it does address a fundamental issue in the case. It relates to matters that were within RBC's knowledge. RBC knew that there, in fact, was a final push. And it's the type of thing where it's not unfair to expect a party to accurately present facts within its control.[279]

At the conclusion of oral argument on the issue, the trial court suggested that "[t]he cases speak of bad faith being reserved for rare situations involving cases of 'glaring egregiousness.'"[280] It further suggested that this standard of conduct "implies that we're comfortable with some egregiousness, we're even comfortable with relatively considerable egregiousness. We're just not comfortable with 'glaring egregiousness.'"[281] This is a matter that is within the discretion of the trial judge and, while this is a close

---

[277] A1941.

[278] A1963.

[279] Ans. Br. Ex. A. Tr. 71:10-72:5 (Feb. 12, 2015).

[280] *Id.* at 67:17-19.

[281] *Id.* at 67:21-24.

issue, we decline to find an abuse of discretion, even though we might have come to a different conclusion if we were reviewing this as an original application. [282]

## IV. CONCLUSION

For the foregoing reasons, the Final Order and Judgment of the Court of Chancery is hereby **AFFIRMED**.

---

[282] In *Dobler,* we reversed a finding by the Court of Chancery that a defendant's conduct was not "sufficiently egregious to justify fee-shifting." 880 A.2d at 227. In so doing, we observed that the defendants "repeatedly acted in bad faith" during the litigation process, thereby justifying an award of reasonable attorneys' fees. *Id.* at 229. Despite our serious concern about the statements described above, we will defer to the trial court in this instance. *Cf. Kane v. Burnett*, 2003 WL 231619 (Del. Jan. 30, 2003) (holding that "this Court must apply the deferential abuse of discretion standard of review and, in the absence of an abuse of discretion, must affirm the [trial court's] award [of attorneys' fees], even though we might have reached a different conclusion") (citation omitted).